
quality in the area. Further, the State of New Mexico must provide 30-day public notice for all proposed permitting actions for new major sources and major modifications going through NNSR permitting. The NMED provided public review and comment on the revisions to the New Mexico NNSR permitting program.[9] The EPA is also providing a 30-day public comment period on our proposed approval of the submitted revisions to the New Mexico NNSR permitting program. For these reasons, this proposed action is not anticipated to have a disproportionately high or adverse human health or environmental effects on communities with environmental justice concerns.

### V. Incorporation by Reference

In this action, we are proposing to include in a final rule regulatory text that includes incorporation by reference. In accordance with the requirements of 1 CFR 51.5, we are proposing to incorporate by reference revisions to the New Mexico regulations as described in the Section III of this preamble, Proposed Action. We have made, and will continue to make, these documents generally available electronically through *https://www.regulations.gov* (please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section of this preamble for more information).

### VI. Statutory and Executive Order Reviews

Under the CAA, the Administrator is required to approve a SIP submission that complies with the provisions of the Act and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, the EPA's role is to approve state choices, provided that they meet the criteria of the CAA. Accordingly, this action merely proposes to approve state law as meeting Federal requirements and does not impose additional requirements beyond those imposed by state law. For that reason, this action:

• Is not a ''significant regulatory action'' subject to review by the Office of Management and Budget under Executive Orders 12866 (58 FR 51735, October 4, 1993) and 13563 (76 FR 3821, January 21, 2011);

• Does not impose an information collection burden under the provisions of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*);

• Is certified as not having a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*);

• Does not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4);

• Does not have federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999);

• Is not an economically significant regulatory action based on health or safety risks subject to Executive Order 13045 (62 FR 19885, April 23, 1997);

• Is not a significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001);

• Is not subject to requirements of section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the CAA; and

• Does not provide EPA with the discretionary authority to address, as appropriate, disproportionate human health or environmental effects, using practicable and legally permissible methods, under Executive Order 12898 (59 FR 7629, February 16, 1994).

In addition, the SIP is not approved to apply on any Indian reservation land or in any other area where EPA or an Indian tribe has demonstrated that a tribe has jurisdiction. In those areas of Indian country, the proposed rule does not have tribal implications and will not impose substantial direct costs on tribal governments or preempt tribal law as specified by Executive Order 13175 (65 FR 67249, November 9, 2000).

### List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Carbon monoxide, Incorporation by reference, Intergovernmental relations, Lead, Nitrogen dioxide, Ozone, Particulate matter, Reporting and recordkeeping requirements, Sulfur oxides, Volatile organic compounds.

**Authority:** 42 U.S.C. 7401 *et seq.*

Dated: August 5, 2022.

**Earthea Nance,**

*Regional Administrator, Region 6.*

[FR Doc. 2022–17384 Filed 8–18–22; 8:45 am]

**BILLING CODE 6560–50–P**

---

[9] The NMED proposed revisions to the New Mexico NNSR Program on April 20, 2021, with a public hearing held on June 25, 2021.

---

**DEPARTMENT OF DEFENSE**

**GENERAL SERVICES ADMINISTRATION**

**NATIONAL AERONAUTICS AND SPACE ADMINISTRATION**

**48 CFR Parts 1, 7, 22, 36, and 52**

[FAR Case 2022–003; Docket No. FAR–2022–0003, Sequence No. 1]

**RIN 9000–AO40**

**Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects**

**AGENCY:** Department of Defense (DoD), General Services Administration (GSA), and National Aeronautics and Space Administration (NASA).

**ACTION:** Proposed rule.

---

**SUMMARY:** DoD, GSA, and NASA are proposing to amend the Federal Acquisition Regulation (FAR) to implement an Executive Order pertaining to project labor agreements in Federal construction projects.

**DATES:** Interested parties should submit comments to the Regulatory Secretariat Division at the address shown below on or before October 18, 2022 to be considered in the formulation of a final rule.

**ADDRESSES:** Submit comments in response to FAR Case 2022–003 to *https://www.regulations.gov.* Submit comments via the Federal eRulemaking portal by searching for ''FAR Case 2022–003''. Select the link ''Comment Now'' that corresponds with ''FAR Case 2022–003.'' Follow the instructions provided on the screen. Please include your name, company name (if any), and ''FAR Case 2022–003'' on your attached document. If your comment cannot be submitted using *https://www.regulations.gov,* call or email the points of contact in the **FOR FURTHER INFORMATION CONTACT** section of this document for alternate instructions.

*Instructions:* Please submit comments only and cite ''FAR Case 2022–003'' in all correspondence related to this case. All comments received will be posted without change to *https://www.regulations.gov,* including any personal and/or business confidential information provided. To confirm receipt of your comment(s), please check *https://www.regulations.gov,* approximately two to three days after submission to verify posting.

**FOR FURTHER INFORMATION CONTACT:** Ms. Dana Bowman, Procurement Analyst, at 202–803–3188 or by email at *dana.bowman@gsa.gov,* for clarification

of content. For information pertaining to status or publication schedules, contact the Regulatory Secretariat Division at 202–501–4755 or *GSARegSec@gsa.gov.* Please cite FAR Case 2022–003.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

DoD, GSA, and NASA are proposing to amend the FAR to implement Executive Order (E.O.) 14063, Use of Project Labor Agreements for Federal Construction Projects, issued February 4, 2022 (87 FR 7363, February 9, 2022). E.O. 14063 mandates that Federal Government agencies require the use of project labor agreements (PLAs) for large-scale Federal construction projects, where the total estimated cost to the Government is $35 million or more, unless an exception applies. Agencies still have the discretion to require PLAs for Federal construction projects that do not meet the $35 million threshold. The E.O. also directs the Office of Management and Budget (OMB) to issue implementation guidance to agencies on exceptions and reporting.

E.O. 14063 describes large-scale construction projects as often posing special challenges to efficient and timely procurement by the Federal Government. Large-scale construction projects often have multiple employers at a single location and a lack of permanent workforce, which makes it difficult for Federal contractors to predict labor costs when bidding on contracts and to ensure that a steady supply of labor exists on the contracts being performed. Additionally, a labor dispute involving one employer can delay the entire project.

The E.O. explains that the lack of coordination among various employers, or uncertainty about the employment terms and conditions of various groups of workers, can create friction and disputes in the absence of an agreed-upon resolution mechanism. PLAs may provide structure and stability needed to reduce uncertainties for all parties connected to a large-scale construction project.

The current FAR is based on the final rule in FAR Case 2009–005, Use of Project Labor Agreements for Federal Construction Projects, published April 13, 2010 (75 FR 19168). The final rule implemented E.O. 13502, which encouraged the use of PLAs for large-scale Federal construction projects valued at $25 million or more in order to promote economy and efficiency in Federal procurement. E.O. 13502 is revoked by E.O. 14063 upon the effective date of the final rule in FAR Case 2022–003.

**II. Discussion and Analysis**

DoD, GSA, and NASA are proposing to revise FAR subpart 22.5, Use of Project Labor Agreements for Federal Construction Projects, to reflect the change in policy pertaining to the use of PLAs. While the reasons for using PLAs remain largely unchanged from the previous policy, use of a PLA is no longer discretionary for large-scale Federal construction projects. Agencies will be required to use a PLA for large-scale Federal construction projects unless an exception applies. The E.O. also expands the definition of ''construction,'' raises the threshold for a large-scale construction project from $25 million to $35 million, and establishes a series of exceptions to the PLA requirements. A summary of the proposed changes follows.

*A. FAR Part 1*

FAR 1.106, OMB approval under the Paperwork Reduction Act, updates the OMB control number that covers PLAs. OMB Control Number 9000–0175, Use of Project Labor Agreements for Federal Construction Projects, was approved in FAR case 2009–005 (see section G of that rule's preamble). Effective March 31, 2019, the clause and provision previously included in 9000–0175 were consolidated under OMB Control Number 9000–0066, which covers a number of labor-related requirements.

*B. FAR Part 7*

Agency-head responsibilities at FAR 7.103(x) pertaining to the use of PLAs are revised to reflect the change in policy consistent with other requirements of agency planners.

*C. FAR Part 22*

FAR subpart 22.5 is revised to replace all references to revoked E.O. 13502 with references to the new E.O. 14063.

The definitions of ''construction,'' ''labor organization,'' and ''large-scale construction project'' are revised to reflect the definitions in E.O. 14063. Conforming changes are made in the clause at FAR 52.222–34, Project Labor Agreement.

The threshold for a large-scale construction project is increased from $25 million to $35 million. This threshold will be subject to the periodic adjustment for inflation of statutory acquisition-related dollar thresholds in accordance with FAR 1.109, 41 U.S.C. 1908, and section 2(c) of E.O. 14063.

FAR 22.503 is revised to reflect the change in policy that mandates agencies to require the use of PLAs when awarding Federal construction contracts that meet the threshold of a large-scale construction project unless an exception applies. Agencies may continue to require PLAs for projects that do not meet the $35 million threshold at their discretion. The proposed rule maintains existing FAR guidance that agencies may use when making a decision to require a PLA for such a contract.

Some agencies use indefinite-delivery indefinite-quantity (IDIQ) contracts to award orders for large-scale construction projects. IDIQ contracts may cover multiple projects of varying values. For an order at or above $35 million, an agency shall require a PLA, unless an exception applies. An exception may only apply to the entire IDIQ contract if the basis for the exception cited would apply to all orders. Use of PLAs on orders is also not restricted to those projects valued at or above the $35 million threshold. The offerors are alerted in the provision at FAR 52.222–33, Notice of Requirement for Project Labor Agreement, that a PLA may be required at the order stage. The clause at FAR 52.222–34 allows the contracting officer to choose when to require the executed PLA, with the order offer, after the offer but prior to order award, or after award of the order.

FAR 22.504(c) is revised to remove direction that allowed agencies to specify terms and conditions of the PLAs and to engage in efforts to identify the appropriate terms and conditions for a particular construction project. DoD, GSA, and NASA believe the language at 22.504(b)(6), which authorizes agencies to ensure the PLA includes any additional requirements as the agency deems necessary to satisfy its needs, is sufficient. Further, the E.O. directs that an agency may not require contractors or subcontractors to enter into a PLA with any particular labor organization. The proposed rule replaces the current text at FAR 22.504(c) with this direction. Conforming changes are made in the provision at FAR 52.222–33, Notice of Requirement for Project Labor Agreement, and the clause at FAR 52.222–34, Project Labor Agreement.

The E.O. provides an exception from the PLA requirements that, with a written explanation, may be granted by a senior official. The proposed rule interprets the senior official as the senior procurement executive. The authority to grant an exception is added at FAR 22.504(d). The exception may be granted in each of the following circumstances, as provided in the E.O.:

1. Requiring a PLA would not achieve economy and efficiency in Federal procurement, as described in 22.504(d);

2. Requiring a PLA would substantially reduce the number of potential bidders so as to frustrate full and open competition, *i.e.,* where

adequate competition at a fair and reasonable price could not be achieved; or

3. Requiring a PLA would be inconsistent with statutes, regulations, other E.O.s, or Presidential Memoranda.

The decision regarding whether to grant an exception for an order under an IDIQ contract should be made prior to issuing the notice of intent to place an order.

*D. FAR Part 52*

The provision at FAR 52.222–33, Notice of Requirement for Project Labor Agreement, and the clause at FAR 52.222–34, Project Labor Agreement, include changes discussed in section II.C. of this preamble. Additional minor changes are proposed for clarity.

### III. Applicability to Contracts at or Below the Simplified Acquisition Threshold (SAT) and for Commercial Products (Including Commercially Available Off-the-Shelf (COTS) Items), or for Commercial Services

This rule amends the provision at FAR 52.222–33 and the FAR clause at 52.222–34. However, this rule does not impose any new requirements on contracts at or below the SAT or for commercial products and commercial services, including COTS items. Since the provision and clause apply to large-scale Federal construction contracts, neither would apply to acquisitions at or below the SAT or to acquisitions for commercial products and commercial services, including COTS items.

### IV. Expected Impact of the Rule

A project labor agreement (PLA) is defined as a pre-hire collective bargaining agreement with one or more labor organizations that establishes the terms and conditions of employment for a specific construction project and is an agreement described in 29 U.S.C. 158(f). PLAs are a tool that can be used to provide labor-management stability, and ensure compliance with laws and regulations such as those governing safety and health, equal employment opportunity, labor and employment standards, and others. Requiring a PLA means that every contractor and subcontractor engaged in construction on the project agree, for that project, to negotiate or become a party to a project labor agreement with one or more labor organizations.

Currently, the regulations at FAR 22.5 encourage the use of PLAs for ''large-scale federal construction projects,'' which is defined as projects with a total cost of $25 million or more. According to the data collected by OMB, between the years of 2009 and 2021, there were a total of approximately 2,000 eligible contracts and the requirement for a PLA was used 12 times. Based on the information, on average there are approximately 167 eligible awards annually and approximately one award that includes the PLA requirement.

This rule implements E.O. 14063, Use of Project Labor Agreements for Federal Construction Projects, which requires the use of PLAs in large-scale Federal construction projects unless an exception applies. In accordance with the E.O., the definition of ''large-scale federal construction projects'' is amended from $25 million or more to $35 million or more. Based on Federal Procurement Data System (FPDS) data from fiscal year (FY) data from FY 2019 through FY 2021, the average number of construction awards, including orders against indefinite-delivery indefinite-quantity contracts valued at $35 million or more, were approximately 119 annually. The average cost of each award is approximately $114 million.

In accordance with the E.O., this rule provides exceptions to the requirement to use PLAs for large-scale Federal construction projects. Exceptions must be based on at least one of the conditions listed at FAR 22.504(d). These conditions include when the requirement for a PLA would not advance the Federal Government's interests; where market research indicates a substantial reduction in competition to such a degree that adequate competition at a fair and reasonable price could not be achieved; or where the requirement would be inconsistent with other statutes, regulations, E.O.s, or Presidential memoranda. There is no data on the number of exceptions that may be granted since the mandate and associated exceptions are new. It is possible there may be a higher usage of exceptions in the initial year as industry and the Government work to implement the requirement. Considering the lack of available data on the proposed exceptions, it is estimated that exceptions may be granted for 10 percent to 50 percent of covered contracts; in other words, an estimated 60 to 107 construction contract awards may require PLAs.

The current FAR provision at 52.222–33, Notice of Requirement for Project Labor Agreement, provides a basic provision and 2 alternative provisions for the contracting officer to select from. The provision selected identifies whether all offerors, the apparent successful offeror, or the awardee must provide a copy of the PLA. There is no historical data on the selection of alternatives. Therefore, it is assumed each alternative will apply one third of the time. This implies one third of affected solicitations will require all offerors to provide a PLA, and two thirds of affected solicitations will only require one entity (apparent successful offeror or awardee) to provide a PLA. To estimate the number of offerors that would be required to provide a PLA, the Government estimates an average of 4 offers would be submitted per award; *i.e.,* an estimated 80–144 offerors (20–36 awards * 4 offers). Therefore, the total number of estimated entities that would be required to submit PLAs at the prime contract level is 120–215 entities (40–71 apparent successful offerors or awardees + 80–144 offerors). It is estimated that 20 percent of the entities will be small entities, therefore approximately 24–43 small entities and 96—172 large entities may be required to submit PLAs. For the estimated 120–215 entities that will be required to have a PLA to submit an offer or perform a contract, generally the entity will negotiate the terms and conditions of the PLA with a union(s). It is assumed an entity will require the owner or a senior executive, legal counsel, a project manager, and 1–2 labor advisors, depending on the size of the workforce, to support the negotiations. DoD, GSA, and NASA estimate that 40 to 80 hours of time may be required in total for each party involved in negotiating the PLA on behalf of the contractor. According to the Bureau of Labor Statistics (BLS) National Occupational Employment and Wage Estimates for May 2021, the mean hourly wage for General and Operations Managers is $55.41/hour, $71.17 for Lawyers, and $102.41 for Chief Executives. To reflect the variety of labor categories necessary to estimate the impact, a mean hourly rate of $76.33 is used for this calculation. The current BLS factor of 42 percent is applied to the mean wage to account for fringe benefits and an additional 12 percent overhead factor is applied (See Attachment C of OMB Circular A–76 Revised issued May 29, 2003), for a total loaded wage of $121.40/hour ($76.33 * 142 percent * 112 percent). Also, it is estimated that 1 hour is required by one member of the contractor's workforce to submit the PLA to the Government on behalf of the contractor. Using the BLS wage estimates for Office and Administrative Support Occupations, the mean hourly rate for submitting the PLA is estimated to be $33.21 (20.88 * 142 percent * 112 percent). The total estimated impact for establishing and submitting PLAs in response to a Government contract is $2.92–$10.45 million (120–215 entities *((5

participants * 40–80 hours * $121.40) + (1 person * 1 hour * $33.21)). Taking midpoints of each range implies a primary estimate of $6.69 million.

The requirement for a PLA flows down to subcontractors through FAR clause 52.222–34, paragraph (c). There is no data source that identifies the number of subcontractors per contract, however, based upon estimates from experts, it is estimated that for each contract there is an average of 2 subcontractors. Therefore, the requirement for PLAs is estimated to apply to 240—430 subcontractors (120–215 * 2).

Subcontractors that may be required to participate in a PLA will generally review and sign on to the PLA negotiated by the prime contractor. The subcontractor does not negotiate the PLA. However, the subcontractor must read, understand, and implement the terms and conditions included in the PLA. These actions are estimated to take 1 to 10 hours. Representatives on behalf of a subcontractor may include the owner, project manager, or an attorney. Based upon the previously provided BLS data, a total loaded wage of $121.40 reflects the variety of labor categories necessary to estimate the impact of the proposed rule on subcontractors. The total estimated impact for establishing and submitting PLAs in response to a Government contract is estimated to be $58,272 to $1.04 million (240–430 subcontractors * (2 participants * 1–10 hours * $121.40)). Taking midpoints of each range implies a primary estimate of $549,136.

For the Government, contracting officers will continue to conduct market research and consider factors to support a decision to use, or not to use, PLAs in large-scale construction projects. There will continue to be instances where the use of PLAs will benefit the Government and others where it is not feasible to use PLAs. This rule establishes new procedures for the contracting officer to request an exception to the requirement to use PLAs. The new procedures require the contracting officer to prepare a written explanation to request an exception and route the request for approval by the senior procurement executive. The act of preparing and routing an exception request is typically performed by a contract specialist customarily at the GS–12 step 5 level and is estimated to take an average of 2 hours. The hourly rate of $65.77 is based upon the Office of Personnel Management (OPM) Table for the Rest of the United States, effective January 2022, for a GS–12 step 5 employee ($43.10 per hour) plus a 36.25 percent factor to account for fringe benefits in accordance with current OMB memorandum M–08–13 and a 12 percent overhead factor (See Attachment C of OMB Circular A–76 Revised issued May 29, 2003). As stated previously, the estimated number of exception requests per year is between 12 and 60; therefore, the anticipated cost for preparing and routing requests is $1,578–$7,892 (12–60 exceptions * 2 hours * $65.77). Taking midpoints of each range implies a primary estimate of $4,735.

The review and approval of the exception request is normally performed at the GS–15 or higher level and is estimated to take approximately 1 hour. The hourly rate of $108.71 is based upon OPM Table for the Rest of the United States, effective January 2022, for a GS–15 step 5 employee ($71.24 per hour) plus the 36.25 percent factor to account for fringe benefits and a 12 percent factor for overhead. The estimated cost for review and approval is between $1,305–6,523 (12–60 exceptions * 1 hour * $108.71). Taking midpoints of each range implies a primary estimate of $3,914.

Public comments are invited on the use of these factors, including whether there are other factors that might be more appropriate for use in the construction industry.

### V. Executive Orders 12866 and 13563

Executive Orders (E.O.s) 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). E.O. 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This is anticipated to be a significant regulatory action and, therefore, was subject to review under section 6(b) of E.O. 12866, Regulatory Planning and Review, dated September 30, 1993.

### VI. Congressional Review Act

As required by the Congressional Review Act (5 U.S.C. 801–808), before an interim or final rule takes effect, DoD, GSA, and NASA will send the rule and the ''Submission of Federal Rules Under the Congressional Review Act'' form to each House of the Congress and to the Comptroller General of the United States. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This rule is not anticipated to be a major rule under 5 U.S.C. 804.

### VII. Regulatory Flexibility Act

DoD, GSA, and NASA do not expect this rule to have a significant economic impact on a substantial number of small entities within the meaning of the Regulatory Flexibility Act, 5 U.S.C. 601–612, because the use of a PLA is required only on large-scale construction projects with a total estimated contract value of $35 million or more. However, an Initial Regulatory Flexibility Analysis (IRFA) has been performed and is summarized as follows:

DoD, GSA, and NASA are proposing to amend the Federal Acquisition Regulation (FAR) to implement Executive Order (E.O.) 14063, Use of Project Labor Agreements for Federal Construction Projects, dated February 4, 2022, which mandates that Federal Government agencies require the use of project labor agreements (PLAs) for large-scale Federal construction projects (total estimated value of $35 million or more), unless an exception applies. Agencies still have the discretion to require PLAs for Federal construction projects that do not meet the $35 million threshold.

The objective of the rule is to implement the E.O. 14063 change in policy from discretionary use to requiring the use of PLAs for Federal construction projects valued at $35 million or more.

This rule applies the requirement for PLAs to all construction projects valued at $35 million or more, unless an exception applies. However, it does not change the discretionary use of PLAs for projects that do not meet the $35 million threshold. As a result, small entities may be required to negotiate and become a party to a PLA, as a prime or subcontractor.

Data generated from the Federal Procurement Data System (FPDS) for fiscal years 2019, 2020, and 2021 has been used as the basis for estimating the number of unique small entities expected to be affected by the change from discretionary to mandatory use of PLAs for large-scale construction projects.

An examination of this data reveals that the Government issued an average of 119 large-scale construction awards annually. Of those 119 awards, an average of 15 percent were awarded to an average of 16 unique small entities annually.

It is estimated that 60–107 of the 119 large-scale construction awards will require a PLA. An estimated one third of affected solicitations will require all offerors to provide a PLA, and two thirds of affected solicitations will only require one entity (apparent successful offeror or awardee) to provide a PLA. Therefore, the total number of estimated entities that would be required to submit PLAs at the prime contract level is 120–215 entities (40–71 apparent successful offerors or awardees + 80–144 offerors).

It is estimated that under the new project labor agreement requirements, the estimated number of small entities impacted by the rule is 20 percent of the 120–215 entities.

Therefore, it is estimated that approximately 24–43 small entities will be required to submit a project labor agreement.

DoD, GSA, and NASA acknowledge there is no data source that identifies the number of subcontractors per contract, however, based upon estimates from experts, it is estimated that each of the entities required to submit project labor agreements may have approximately 2 subcontractors; *i.e.* 240–430 subcontractors (120 * 2) (215 * 2). It is estimated that an equivalent percentage of small entities are subcontractors as prime contractors. As a result, it is estimated that 20 percent or 48–86 of the subcontractors are small entities (240 * 0.2) (430 * 0.2).

Based upon this analysis, the number of small entities that may be required to negotiate or become a party to a PLA is approximately 72 to 129 annually (24 + 48) (43 + 86). These numbers may fluctuate based on the use of discretionary PLAs, any exceptions granted to the required use of a PLA, or if the PLA is required by all offerors, the apparent successful offeror, or the awardee. The proposed rule does not duplicate, overlap, or conflict with any other Federal rules.

There are no known significant alternative approaches to the proposed rule.

The Regulatory Secretariat Division has submitted a copy of the IRFA to the Chief Counsel for Advocacy of the Small Business Administration. A copy of the IRFA may be obtained from the Regulatory Secretariat Division. DoD, GSA, and NASA invite comments from small business concerns and other interested parties on the expected impact of this rule on small entities.

DoD, GSA, and NASA will also consider comments from small entities concerning the existing regulations in subparts affected by the rule in accordance with 5 U.S.C. 610. Interested parties must submit such comments separately and should cite 5 U.S.C. 610 (FAR Case 2022–003), in correspondence.

**VIII. Paperwork Reduction Act**

The Paperwork Reduction Act (44 U.S.C. 3501–3521) applies because the proposed rule contains information collection requirements. Accordingly, the Regulatory Secretariat has submitted a request for approval of a revised information collection requirement concerning 9000–0066, Labor-related Requirements, to the Office of Management and Budget.

This rule affects the certification and information collection requirements in the provision at FAR 52.222–33, Notice of Requirement for Project Labor Agreement, and the FAR clause at 52.222–34, Project Labor Agreements. The information collection requirements were originally approved under OMB Control Number 9000–0175, Use of Project Labor Agreements for Federal Construction Projects. The estimate used in the current information collection was based on PLAs with a total estimated contract value of $25 million or more and the discretionary authority to use them. The burden hour estimates for the provision at FAR 52.222–33 and the clause at FAR 52.222–34 previously included under OMB Control Number 9000–0175 are consolidated with and approved under OMB Control Number 9000–0066, Labor-related Requirements.

*A. Estimated Public Reporting Burden*

Public reporting burden for this collection of information is estimated to average 1.0 hour per response, including the time for reviewing instructions, searching existing data sources, gathering, and maintaining the data needed, and completing and reviewing the collection of information. This is not the time to negotiate the PLA, which is not an information collection requirement; the time covered is only the time to copy and submit the PLA to the contracting officer.

FAR provision 52.222–33, Notice of Requirement for Project Labor Agreement, is prescribed at FAR 22.505(a) for use in solicitations for the acquisition of large-scale construction projects. A large-scale construction project is defined as one within the United States with a total cost to the Federal Government of $35 million or more. According to FPDS, the Government awarded an average of 119 large-scale construction contracts to approximately 110 unique entities each year, to include orders against indefinite-delivery indefinite-quantity contracts, valued at $35 million or more, from FY 2019 through 2021. The Government also considered that exceptions to the required use of a PLA may be granted under certain conditions and estimates that approximately 12 to 60 (10 percent to 50 percent of 119) exceptions will be granted for the required use of a PLA each year. Due to the lack of historical data, the Government is using a range to estimate the number of PLAs that will be required from a low of 60 (50 percent) to a high of 107 (90 percent).

Although agencies have the discretion to require a PLA when the estimated value of the construction project is less than the $35 million threshold, the Government estimates that agencies will choose to require PLAs for less than 1 percent of construction awards each year.

It is projected that for all contracts requiring a PLA (60–107), the contracting officer will identify if all offerors, the apparent successful offeror, or the awardee is required to negotiate or become a party to a PLA. There is no historical data on when the contracting officer requires the PLA. Therefore, it is assumed that the alternatives will apply $\frac{1}{3}$ of the time equally ($^{60}\!/_3$ or $^{107}\!/_3$), meaning approximately 20 to 36 awards will require all offerors to provide a PLA and 40 to 71 awards will require the apparent successful offeror or awardee. The Government estimates that an average of 4 offers will be submitted for each of the estimated awards, resulting in an estimated 120 to 215 respondents. The annual reporting burden estimates that 120 to 215 of the respondents would be requested to submit a PLA. The Government estimates that each respondent will require between 40 (low) and 80 (high) hours to implement a PLA for a project. This includes time for offerors to consult with advisors, negotiate, ensure compliance with terms and conditions of the PLA and implement the PLA.

The annual reporting burden for FAR provision 52.222–33, Notice of Requirement for Project Labor Agreement, is estimated based upon the ranges described above and illustrated as follows:

|  | Range of burden based upon 40 hours | | Range of burden based upon 80 hours | |
| --- | --- | --- | --- | --- |
| Respondents | 120 | 215 | 120 | 215 |
| Responses per respondent | 1 | 1 | 1 | 1 |
| Total annual responses | 120 | 215 | 120 | 215 |
| Preparation hours per responses | 200 | 200 | 400 | 400 |
| Total response burden hours | 24,000 | 43,000 | 48,000 | 86,000 |

The application of the provision is expanded to recognize IDIQ contracts and the resultant ability to require or not require PLAs on an order-by-order basis under the IDIQ. The change in policy that makes the use of a PLA mandatory unless an exception applies may also increase the estimates while the increased threshold for defining a large-scale construction project may have a balancing effect. It is expected that the use of discretionary PLAs and agency-issued exceptions will further impact public and Government burden. In addition, the hourly rates have increased from 2021 to 2022.

FAR clause 52.222–34, Project Labor Agreement, is prescribed at FAR 22.505(a) for use in contracts for the acquisition of large-scale construction projects. Each of the 60 to 107 awardees is expected to have one recordkeeper to maintain the PLA and associated records for the participants through the life of the contract.

The annual recordkeeping burden for FAR clause 52.222–34, Project Labor Agreement, is estimated using the range of 60 to 107 awardees as follows:

|  | Range of awardees | |
|---|---|---|
| Estimated recordkeepers | 60 | 107 |
| Estimated records per recordkeeper | 1 | 1 |
| Total annual records | 60 | 107 |
| Estimated hours/record | 3 | 3 |
| Total recordkeeping burden hours | 180 | 321 |

The total estimated annual public burden hours associated with the FAR provision and clause is estimated between 24,180 (24,000 reporting hours + 180 recordkeeping hours) and 86,321 (86,000 reporting + 321 recordkeeping hours).

*B. Request for Comments Regarding Paperwork Burden.*

Submit comments, including suggestions for reducing this burden, not later than October 18, 2022 through *http://www.regulations.gov* and follow the instructions on the site. All items submitted must cite OMB Control No. 9000–0066, Labor Related Requirements. Comments received generally will be posted without change to *https://www.regulations.gov,* including any personal and/or business confidential information provided. To confirm receipt of your comment(s), please check *https:// www.regulations.gov,* approximately two to three days after submission to verify posting. If there are difficulties submitting comments, contact the GSA Regulatory Secretariat Division at 202– 501–4755 or *GSARegSec@gsa.gov.*

Public comments are particularly invited on:

• The necessity of this collection of information for the proper performance of the functions of Federal Government acquisitions, including whether the information will have practical utility.

• The accuracy of the estimate of the burden of this collection of information.

• Ways to enhance the quality, utility, and clarity of the information to be collected; and

• Ways to minimize the burden of the collection of information on respondents, including the use of automated collection techniques or other forms of information technology.

Requesters may obtain a copy of the information collection documents from the GSA Regulatory Secretariat Division by calling 202–501–4755 or emailing *GSARegSec@gsa.gov.* Please cite OMB Control No. 9000–0066, Labor-related Requirements, in all correspondence.

**List of Subjects in 48 CFR Parts 1, 7, 22, 36, and 52**

Government procurement.

**William F. Clark,**

*Director, Office of Government-wide Acquisition Policy, Office of Acquisition Policy, Office of Government-wide Policy.*

Therefore, DoD, GSA, and NASA propose amending 48 CFR parts 1, 7, 22, 36, and 52 as set forth below:

■ 1. The authority citation for 48 CFR parts 1, 7, 22, 36, and 52 continues to read as follows:

**Authority:** 40 U.S.C. 121(c); 10 U.S.C. chapter 137; and 51 U.S.C. 20113.

## PART 1—FEDERAL ACQUISITION REGULATIONS SYSTEM

■ 2. In section 1.106 amend the table by:
■ a. Removing the entry for FAR segment ''22.5''; and
■ b. Adding in sequence, entries for ''52.222–33'' and ''52.222–34''.

The additions read as follows:

**1.106 OMB approval under the Paperwork Reduction Act.**

\* \* \* \* \*

| FAR segment | OMB control No. |
|---|---|
| \* \* \* \* \* | |
| 52.222–33 | 9000–0066 |
| 52.222–34 | 9000–0066 |
| \* \* \* \* \* | |

\* \* \* \* \*

## PART 7—ACQUISITION PLANNING

■ 3. Amend section 7.103 by revising paragraph (x) to read as follows:

**7.103 Agency-head responsibilities.**

\* \* \* \* \*

(x) Ensuring that agency planners use project labor agreements when required (see subpart 22.5 and 36.104).

\* \* \* \* \*

## PART 22—APPLICATION OF LABOR LAWS TO GOVERNMENT ACQUISITIONS

■ 4. Revise section 22.501 to read as follows:

**22.501 Scope of subpart.**

This subpart prescribes policies and procedures to implement Executive Order 14063, Use of Project Labor Agreements for Federal Construction Projects, dated February 4, 2022 (87 FR 7363).

■ 5. Amend section 22.502 by revising the definitions of ''Construction'', ''Labor organization'' and ''Large-scale construction project'' to read as follows:

**22.502 Definitions.**

\* \* \* \* \*

*Construction* means construction, reconstruction, rehabilitation, modernization, alteration, conversion, extension, repair, or improvement of buildings, structures, highways, or other real property.

*Labor organization* means a labor organization as defined in 29 U.S.C. 152(5) of which building and construction employees are members.

*Large-scale construction project* means a Federal construction project within the United States for which the total estimated cost of the construction contract(s) to the Federal Government is $35 million or more.

\* \* \* \* \*

■ 6. Revise section 22.503 to read as follows.

**22.503 Policy.**

(a) Executive Order (E.O.) 14063, Use of Project Labor Agreements for Federal Construction Projects, requires agencies to use project labor agreements in large-scale construction projects to promote economy and efficiency in the administration and completion of Federal construction projects.

(b) When awarding a contract in connection with a large-scale construction project (see 22.502), agencies shall require use of project labor agreements for all contractors and subcontractors engaged in construction on the project, unless an exception at 22.504(d) applies.

(c) An agency may require the use of a project labor agreement on projects where the total cost to the Federal Government is less than that for a large-scale construction project, if appropriate.

(1) An agency may, if appropriate, require that every contractor and subcontractor engaged in construction on the project agree, for that project, to negotiate or become a party to a project labor agreement with one or more labor organizations if the agency decides that the use of project labor agreements will—

(i) Advance the Federal Government's interest in achieving economy and efficiency in Federal procurement, producing labor-management stability, and ensuring compliance with laws and regulations governing safety and health, equal employment opportunity, labor and employment standards, and other matters; and

(ii) Be consistent with law.

(2) Agencies may consider the following factors in deciding whether the use of a project labor agreement is appropriate for a construction project where the total cost to the Federal Government is less than that for a large-scale construction project:

(i) The project will require multiple construction contractors and/or subcontractors employing workers in multiple crafts or trades.

(ii) There is a shortage of skilled labor in the region in which the construction project will be sited.

(iii) Completion of the project will require an extended period of time.

(iv) Project labor agreements have been used on comparable projects undertaken by Federal, State, municipal, or private entities in the geographic area of the project.

(v) A project labor agreement will promote the agency's long term program interests, such as facilitating the training of a skilled workforce to meet the agency's future construction needs.

(vi) Any other factors that the agency decides are appropriate.

(d) For indefinite-delivery indefinite-quantity (IDIQ) contracts the use of a project labor agreement may be required on an order-by-order basis rather than for the entire contract. For an order at or above $35 million, an agency shall require the use of a project labor agreement, unless an exception applies. See 22.504(d)(3) and 22.505(b)(3).

■ 7. Amend section 22.504 by—
■ a. In paragraph (b) introductory text removing the words ''The project'' and adding the words ''A project'' in their place;
■ b. Revising paragraph (c); and
■ c. Adding paragraph (d).

The revision and addition read as follows.

**22.504 General requirements for project labor agreements.**

* * * * *

(c) *Labor organizations.* An agency may not require contractors or subcontractors to enter into a project labor agreement with any particular labor organization when the project labor agreement includes multiple signatory labor organizations representing the same trade.

(d) *Exceptions to project labor agreement requirements*—(1) *Exception.* The senior procurement executive may grant an exception from the requirements at 22.503(b), providing a specific written explanation of why at least one of the following conditions exists with respect to the particular contract:

(i) Requiring a project labor agreement on the project would not advance the Federal Government's interests in achieving economy and efficiency in Federal procurement. The exception shall be based on one or more of the following factors:

(A) The project is of short duration and lacks operational complexity.

(B) The project will involve only one craft or trade.

(C) The project will involve specialized construction work that is available from only a limited number of contractors or subcontractors.

(D) The agency's need for the project is of such an unusual and compelling urgency that a project labor agreement would be impracticable.

(ii) Market research indicates that requiring a project labor agreement on the project would substantially reduce the number of potential offerors to such a degree that adequate competition at a fair and reasonable price could not be achieved. (See 10.002(b)(1) and 36.104). A likely reduction in the number of potential offerors is not, by itself, sufficient to except a contract from coverage under this authority unless it is coupled with the finding that the reduction would not allow for adequate competition at a fair and reasonable price.

(iii) Requiring a project labor agreement on the project would otherwise be inconsistent with statutes, regulations, Executive orders, or Presidential memoranda.

(2) When determining whether the exception in paragraph (d)(1)(ii) of this section applies, contracting officers shall consider current market conditions and the extent to which price fluctuations may be attributable to factors other than the requirement for a project labor agreement (*e.g.,* costs of labor or materials, supply chain costs). Agencies may rely on price analysis conducted on recent competitive proposals for construction projects of a similar size and scope.

(3) *Timing of the exception*—(i) *Contracts other than IDIQ contracts.* The exception must be granted for a particular contract by the solicitation date.

(ii) *IDIQ contracts.* An exception shall be granted prior to the solicitation date if the basis for the exception cited would apply to all orders. Otherwise, exceptions shall be granted for each order by the time of the notice of the intent to place an order (*e.g.,* 16.505(b)(1)).

■ 8. Revise section 22.505 to read as follows.

**22.505 Solicitation provision and contract clause.**

When a project labor agreement is used for a construction project, the contracting officer shall—

(a)(1) Insert the provision at 52.222–33, Notice of Requirement for Project Labor Agreement, in all solicitations containing the clause 52.222–34, Project Labor Agreement.

(2) Use the provision with its Alternate I if the agency will require the submission of a project labor agreement from only the apparent successful offeror, prior to contract award.

(3) Use the provision with its Alternate II if an agency allows submission of a project labor agreement after contract award except when Alternate III is used.

(4) Use the provision with its Alternate III when Alternate II of 52.222–34 is used.

(b)(1) Insert the clause at 52.222–34, Project Labor Agreement, in all solicitations and contracts associated with the construction project.

Case 3:25-cv-00310-SLG     Document 19-3     Filed 03/02/26     Page 7 of 9     AR0007

(2) Use the clause with its Alternate I if an agency allows submission of the project labor agreement after contract award except when Alternate II is used.

(3) Use the clause with its Alternate II in IDIQ contracts when the agency will have project labor agreements negotiated on an order-by-order basis and one or more orders will not use a project labor agreement.

## PART 36—CONSTRUCTION AND ARCHITECT-ENGINEER CONTRACTS

■ 9. Amend section 36.104 by adding paragraph (c) to read as follows:

### 36.104  Policy.

* * * * *

(c)(1) Agencies shall require the use of a project labor agreement for Federal construction projects valued at or above $35 million, unless an exception applies (see subpart 22.5).

(2) Contracting officers conducting market research for Federal construction contracts shall ensure that the procedures at 10.002(b)(1) involve a current and proactive examination of the market conditions in the project area to determine national, regional, and local entity interest in participating on a project that requires a project labor agreement, and to understand the availability of unions, and unionized and non-unionized contractors. Contracting officers may coordinate with agency labor advisors, as appropriate.

## PART 52—SOLICITATION PROVISIONS AND CONTRACT CLAUSES

■ 10. Amend section 52.222–33 by—
■ a. Revising the date of the provision;
■ b. Revising paragraphs (a) and (b);
■ c. Removing from paragraph (c) introductory text "Consistent with applicable law, the project" and adding "The project" in its place;
■ d. Removing from paragraph (c)(1) "offeror and all" and adding "Offeror and" in its place;
■ e. Removing from paragraph (c)(2) "offeror" and adding "Offeror" in its place;
■ f. Removing from paragraph (d) "this contract" and adding "the resulting contract" in its place;
■ g. Removing from paragraph (e) "offeror" and adding "Offeror" in its place;
■ h. In Alternate I:
■ i. Revising the date;
■ ii. Removing from the introductory text "22.505(a)(1)" and "clause" and adding "22.505(a)(2)" and "provision" in their places, respectively;
■ iii. Revising paragraph (b);
■ i. In Alternate II:
■ i. Revising the date;
■ ii. Removing from the introductory text "22.505(a)(2)" and "clause" and adding "22.505(a)(3)" and "provision" in their places, respectively;
■ iii. Revising paragraph (b); and
■ j. Adding Alternate III.

The revisions and addition read as follows:

### 52.222–33  Notice of Requirement for Project Labor Agreement.

* * * * *

**Notice of Requirement for Project Labor Agreement (Date)**

* * * * *

(a) *Definitions.* As used in this provision, the following terms are defined in clause 52.222–34 of this solicitation entitled Project Labor Agreement: "construction," "labor organization," "large-scale construction project," and "project labor agreement."

(b)(1) Offerors shall negotiate or become a party to a project labor agreement with one or more labor organizations for the term of the resulting construction contract.

(2) The Offeror shall not require subcontractors to enter into a project labor agreement with any particular labor organization when the project labor agreement includes multiple signatory labor organizations representing the same trade.

* * * * *

*Alternate I* (Date) * * *

(b)(1) The apparent successful offeror shall negotiate or become a party to a project labor agreement with one or more labor organizations for the term of the resulting construction contract.

(2) The Offeror shall not require subcontractors to enter into a project labor agreement with any particular labor organization when the project labor agreement includes multiple signatory labor organizations representing the same trade.

* * * * *

*Alternate II* (Date). * * *

(b)(1) If awarded the contract, the Offeror shall negotiate or become a party to a project labor agreement with one or more labor organizations for the term of the resulting construction contract.

(2) The Offeror shall not require subcontractors to enter into a project labor agreement with any particular labor organization when the project labor agreement includes multiple signatory labor organizations representing the same trade.

*Alternate III* (Date). As prescribed in 22.505(a)(4), substitute the following paragraph (b) in lieu of paragraphs (b) through (e) of the basic provision:

(b)(1) If awarded the contract, the Offeror may be required by the agency to negotiate or become a party to a project labor agreement with one or more labor organizations for the term of the order. The Contracting Officer will require that an executed copy of the project labor agreement be submitted to the agency—

(i) With the order offer;
(ii) Prior to award of the order; or
(iii) After award of the order.

(2) The Offeror shall not require subcontractors to enter into a project labor agreement with any particular labor organization when the project labor agreement includes multiple signatory labor organizations representing the same trade.

■ 11. Amend section 52.222–34 by—
■ a. Revising the date of the clause;
■ b. Adding in alphabetical order the definitions "Construction" and "Large-scale construction project" in paragraph (a);
■ c. Revising the definition "Labor organization" in paragraph (a);
■ d. Removing from paragraph (b) "this contract in accordance with solicitation provision 52.222–33, Notice of Requirement for Project Labor Agreement" and adding "the contract" in its place;
■ e. Revising paragraph (c);
■ f. In Alternate I:
■ i. Revising the date;
■ ii. Removing from paragraph (b) "Consistent with applicable law, the Contractor shall negotiate a" and adding "The Contractor shall negotiate or become party to a" in its place;
■ iii. Removing from paragraph (c) introductory text "Consistent with applicable law, the project" and adding "The project" in its place;
■ iv. Removing from paragraph (c)(1) "and all" and adding "and" in its place;
■ v. Removing from paragraph (c)(4) "the project" and adding "the term of the project" in its place;
■ vi. Revising paragraph (f); and
■ g. Adding Alternate II.

The revisions and additions read as follows:

### 52.222–34  Project Labor Agreement.

* * * * *

**Project Labor Agreement (Date)**

(a) * * *

*Construction* means construction, reconstruction, rehabilitation, modernization, alteration, conversion, extension, repair, or improvement of buildings, structures, highways, or other real property.

*Labor organization* means a labor organization as defined in 29 U.S.C. 152(5) of which building and construction employees are members.

*Large-scale construction project* means a Federal construction project within the United States for which the total estimated cost of the construction contract(s) to the Federal Government is $35 million or more.

\* \* \* \* \*

(c) *Subcontracts.* (1) The Contractor shall include the substance of this clause, including this paragraph (c), in all subcontracts with subcontractors engaged in construction on the construction project.

(2) The Contractor shall not require subcontractors to enter into a project labor agreement with any particular labor organization when the project labor agreement includes multiple signatory labor organizations representing the same trade.

\* \* \* \* \*

*Alternate I* (Date). \* \* \*

\* \* \* \* \*

(f) *Subcontracts.* (1) The Contractor shall require subcontractors engaged in construction on the construction project to agree to any project labor agreement negotiated by the prime contractor pursuant to this clause, and shall include the substance of paragraphs (d) through (f) of this clause in all subcontracts with subcontractors engaged in construction on the construction project.

(2) The Contractor shall not require subcontractors to enter into a project labor agreement with any particular labor organization when the project labor agreement includes multiple signatory labor organizations representing the same trade.

*Alternate II* (Date). As prescribed in 22.505(b)(3), substitute the following paragraphs (b) through (f) for paragraphs (b) through (f) of the basic clause:

(b) When notified by the agency (*e.g.,* by the notice of intent to place an order under 16.505(b)(1)) that this order will use a project labor agreement, the Contractor shall negotiate or become a party to a project labor agreement with one or more labor organizations for the term of the order. The Contracting Officer shall require that an executed copy of the project labor agreement be submitted to the agency—

(1) With the order offer;
(2) Prior to award of the order; or
(3) After award of the order.

(c) The project labor agreement reached pursuant to this clause shall—

(1) Bind the Contractor and subcontractors engaged in construction on the construction project to comply with the project labor agreement;

(2) Allow contractors and subcontractors to compete for contracts and subcontracts without regard to whether they are otherwise parties to collective bargaining agreements;

(3) Contain guarantees against strikes, lockouts, and similar job disruptions;

(4) Set forth effective, prompt, and mutually binding procedures for resolving labor disputes arising during the term of the project labor agreement;

(5) Provide other mechanisms for labor-management cooperation on matters of mutual interest and concern, including productivity, quality of work, safety, and health; and

(6) Fully conform to all statutes, regulations, Executive orders, and agency requirements.

(d) Any project labor agreement reached pursuant to this clause does not change the terms of this contract or provide for any price adjustment by the Government.

(e) The Contractor shall maintain in a current status throughout the life of the order any project labor agreement entered into pursuant to this clause.

(f) *Subcontracts.* (1) For each order that uses a project labor agreement, the Contractor shall—

(i) Require subcontractors engaged in construction on the construction project to agree to any project labor agreement negotiated by the prime contractor pursuant to this clause; and

(ii) Include the substance of paragraphs (d) through (f) of this clause in all subcontracts with subcontractors engaged in construction on the construction project.

(2) The Contractor shall not require subcontractors to enter into a project labor agreement with any particular labor organization when the project labor agreement includes multiple signatory labor organizations representing the same trade.

[FR Doc. 2022–17067 Filed 8–18–22; 8:45 am]

**BILLING CODE 6820–EP–P**