Kerry Hunt, Tenn. Bar. No. 037742*
Charles M. Brandt, D.C. Bar No. 90029325*
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
KerryHunt@pacificlegal.org
CBrandt@pacificlegal.org

Luke A. Wake, Cal. Bar No. 264647*
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
LWake@pacificlegal.org

*Pro Hac Vice

Attorneys for Plaintiff
Slayden Plumbing & Heating, Inc.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| SLAYDEN PLUMBING & HEATING, INC., | Case No 3:25-cv-00310-SLG |
| Plaintiff, | |
| v. | |
| GENERAL SERVICES ADMINISTRATION; JEFFREY KOSES, in his official capacity as Senior Procurement Executive, General Services Administration; DEPARTMENT OF DEFENSE; JOHN TENAGLIA, in his official capacity as Principal Director, Defense Pricing and Contracting, Office of Secretary of Defense; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; MARVIN HORNE, in his official capacity as Assistant Administrator for Procurement, National Aeronautics and Space Administration; FEDERAL ACQUISITION | |

REGULATORY COUNCIL; KEVIN RHODES, in his official capacity as Chair of the Federal Acquisition Regulatory Council and Administrator of the Office of Federal Procurement Policy, Office of Management and Budget; and RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and Budget,

Defendants.

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ ii

MOTION FOR SUMMARY JUDGMENT .......................................................... 1

INTRODUCTION ................................................................................................. 1

BACKGROUND AND STATEMENT OF FACTS ........................................... 2

    I.    The Federal Property and Administrative Services Act ........................... 2

    II.   Executive Order 14063 and the Final Rule ............................................ 3

    III.  Major Adverse Impact on Slayden ......................................................... 4

STANDARD OF REVIEW .................................................................................. 6

ARGUMENT ......................................................................................................... 7

    I.    The PLA Mandate Exceeds Statutory Authority ................................... 8

        A.    Section 121(a) Does Not Authorize Direct Regulation of Federal Contractors' Internal Business Practices ........................... 8

        B.    The PLA Mandate Is Not "Necessary to Carry Out" Any Operative Provision ...................................................................... 13

        C.    The PLA Mandate Is Not "Consistent" with Other Provisions ..................... 18

    II.   The Government's Unbridled Interpretation Violates the Nondelegation Doctrine ................................................................................................ 21

    III.  The PLA Mandate Is Arbitrary and Capricious ................................... 26

    IV.  Slayden Has Article III Standing ......................................................... 30

CONCLUSION ..................................................................................................... 31

CERTIFICATE OF SERVICE ........................................................................... 32

# TABLE OF AUTHORITIES

<b>Page(s)</b>

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935)................................................................................................25

*ABC Fla. First Coast Chapter v. GSA*,
Case No. 3:24-cv-318-WWB-MCR (M.D. Fla. Mar. 28, 2025)................................19

*Am. Power & Light Co. v. SEC*,
329 U.S. 90 (1946)................................................................................................24

*Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. Cal.*,
159 F.3d 1178 (9th Cir. 1998) ..............................................................................30

*Biden v. Nebraska*,
600 U.S. 477 (2023)..............................................................................................15

*Bradford v. Dep't of Lab.*
101 F.4th 707 (10th Cir. 2024) ........................................................................22–24

*Cascadia Wildlands v. United States Bureau of Land Mgmt.*,
153 F.4th 869 (9th Cir. 2025) ...............................................................................26

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979)..............................................................................................14

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971)................................................................................................6

*Contractors Ass'n of E. Pa. v. Sec. of Lab.*,
442 F.2d 159 (3d Cir. 1971)...................................................................................12

*Diamond Alternative Energy v. U.S. Env't Prot. Agency*,
606 U.S. 100 (2025)..............................................................................................31

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025).....................................................................................18, 23–24

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985)................................................................................................6

*Frlekin v. Apple, Inc.*,
  979 F.3d 639 (9th Cir. 2020) ................................................................................ 6

*Fuson v. Off. of Navajo and Hopi Indian Relocation*,
  134 F.4th 1010 (9th Cir. 2025) ........................................................................... 27

*Georgia v. President of the U.S.*,
  46 F.4th 1283 (11th Cir. 2022) ...................................................................*passim*

*Kaweah Delta Health Care Dist. v. Becerra*,
  123 F.4th 939 (9th Cir. 2024) ............................................................................. 24

*Kentucky v. Biden*,
  57 F.4th 545 (6th Cir. 2023) .......................................................................*passim*

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022) ...................................................................... 25–26

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...................................................................................... 30–31

*Mayes v. Biden*,
  67 F.4th 921 (9th Cir. 2023) ............................................................................... 22

*Mi Familia Vota v. Fontes*,
  129 F.4th 691 (9th Cir. 2025) ............................................................................. 16

*Mi Familia Vota v. Fontes*,
  152 F.4th 1153 (9th Cir. 2025) ........................................................................... 16

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................................ 8

*MVL USA, Inc. v. United States*,
  174 Fed. Cl. 437 (Jan. 21, 2025) ........................................................................ 19

*N.L.R.B. v. American Nat'l Ins. Co.*,
  343 U.S. 395 (1952) ...................................................................................... 16, 28

*Nebraska v. Su*,
  121 F.4th 1 (9th Cir. 2024) .........................................................................*passim*

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005) .............................................................................. 31

*Perkins v. Lukens Steel Co.*,
  310 U.S. 113 (1940) ........................................................................................ 8

*Phillips v. U.S. Customs & Border Prot.*,
  74 F.4th 986 (9th Cir. 2023) ......................................................................... 30

*Salmon Spawning & Recovery All. v. Gutierrez*,
  545 F.3d 1220 (9th Cir. 2008) ....................................................................... 30

*Solid Waste Agency of Northern Cook Cnty. v. U.S. Army Corps of Engr's*,
  531 U.S. 159 (2001) ...................................................................................... 23

*TransUnion LLC v. Ramerez*,
  594 U.S. 413 (2021) ...................................................................................... 30

*United States v. Butler*,
  297 U.S. 1 (1936) .......................................................................................... 16

*United States v. Cabaccang*,
  332 F.3d 622 (9th Cir. 2003) ......................................................................... 16

*Util. Air Regul. Grp. v. E.P.A.*,
  573 U.S. 302 (2014) ................................................................................. 12, 17

*Uzuegbunam v. Preczewski*,
  592 U.S. 279 (2021) ...................................................................................... 31

*W. Virginia v. Env't Prot. Agency*,
  597 U.S. 697 (2022) ...................................................................................... 25

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ...................................................................................... 24

*Williams v. Taylor*,
  529 U.S. 420 (2000) ...................................................................................... 16

## Constitutional Provisions

U.S. Const. art. I, § 1 ............................................................................................ 24

U.S. Const. art. I, § 8 ............................................................................................ 24

## Statutes

5 U.S.C. § 706 ................................................................................................ 6–7

5 U.S.C. § 706(2)(a) ........................................................................................ 26

28 U.S.C. § 2201 .............................................................................................. 7

29 U.S.C. § 158(d) .......................................................................................... 16

40 U.S.C. § 101 ......................................................................................... 14, 22

40 U.S.C. § 111 ............................................................................................... 15

40 U.S.C. § 111(4) ............................................................................................ 9

40 U.S.C. § 121(a) ..................................................................................*passim*

40 U.S.C. § 121(b)(1)–(3) ............................................................................. 11

40 U.S.C. § 121(c) .......................................................................................... 15

40 U.S.C. § 501(b)(2)(A).................................................................................14

41 U.S.C. § 107 .......................................................................................... 18–19

41 U.S.C. § 113 ............................................................................................... 18

41 U.S.C. § 1303 ............................................................................................. 15

41 U.S.C. § 3103(a), (c).................................................................................. 14

41 U.S.C. § 3301(a)(1) ............................................................................... 18–19

41 U.S.C. § 3306(a)(2)(A)............................................................................7, 18

41 U.S.C. § 3703 ............................................................................................. 14

50 U.S.C. § 4554(a)......................................................................................... 10

National Labor Relations Act, 29 U.S.C. §§ 151–169 .................................... 15

Pub. L. No. 81-152, §§ 101(a), 103(a), 202(a), 203(a), 63 Stat. 377, 379
   (1949) ............................................................................................................ 2

Pub. L. No. 81-152, § 205(a), 63 Stat. 377, 389 (1949).........................3, 9, 12

Pub. L. No. 107-217, § 5(b)(1), 116 Stat. 1062, 1303 (2002) ............................................... 9

**Regulations**

87 Fed. Reg. 7363 (Feb. 4, 2022). ....................................................................................... 3

88 Fed. Reg. 88708 (Dec. 22, 2023) ............................................................................ *passim*

Exec. Order No. 12818, 57 Fed. Reg. 48713 (Oct. 28, 1992) ........................................... 17

Exec. Order No. 12954, 60 Fed. Reg. 13023 (Mar. 8, 1995) ............................................ 13

Exec. Order No. 13201, 66 Fed. Reg. 11221 (Feb. 17, 2001) .......................................... 13

Exec. Order No. 13465, 73 Fed. Reg. 33285 (June 6, 2008) ............................................ 13

Exec. Order No. 13502, 74 Fed. Reg. 6985 (Feb. 11, 2009) ............................................ 17

Exec. Order No. 13658, 79 Fed. Reg. 9851 (Feb. 12, 2014) ............................................ 13

Exec. Order No. 13706, 80 Fed. Reg. 54697 (Sep. 7, 2015) ............................................ 13

Exec. Order No. 14026, 86 Fed. Reg. 22835 (Apr. 27, 2021) .......................................... 13

Exec. Order No. 14042, 86 Fed. Reg. 50985 (Sep. 9, 2021) ............................................ 13

Executive Order 14063, 87 Fed. Reg. 7363 (Feb. 4, 2022) ........................................... 3–4

**Rules**

Fed. R. Civ. P. 56 ................................................................................................................. 1

Fed. R. Civ. P. 56(a) ........................................................................................................... 6

Fed. R. Evid. 201(b)(2) ...................................................................................................... 20

**Other Authorities**

*Economical*, Merriam Webster, https://www.merriam-
webster.com/dictionary/economical ............................................................................ 25

*Efficiency*, Merriam Webster, https://www.merriam-
webster.com/dictionary/efficiency ............................................................................... 25

H.R. Rep. No. 81-670 (1949) ........................................................................................ 2, 12

Manning, John F., *The Absurdity Doctrine*,

116 Harv. L. Rev. 2387, 2457 (2003) .............................................................................. 15

*Necessary*, Black's Law Dictionary (12th ed. 2024) ......................................................... 16

*Necessary*, Oxford English Dictionary (2d ed. 1989) ......................................................... 16

Case 3:25-cv-00310-SLG      Document 20      Filed 03/27/26      Page 9 of 41

# MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, and Civ. L.R. 7.1., Plaintiff Slayden Plumbing & Heating, Inc. hereby moves for summary judgment as to all claims in its Complaint.

## INTRODUCTION

Over the last forty-five years, Bill Slayden has worked hard to transform the small plumbing business he started out of his garage into a leading mechanical contractor working primarily on large-scale federal construction projects. Along the way, Bill amassed an extraordinarily skilled and fiercely independent workforce dead-set on providing the highest quality of service on time and within budget. But now, both Bill's business and his employees' independence lie at the mercy of the federal government.

This unfortunate turn of events has nothing to do with Bill's business—Slayden Plumbing & Heating, Inc. ("Slayden")—which has an unblemished track record working on federal projects. Rather, it stems from President Biden's unauthorized, blanket directive that all federal contractors enter contracts with labor unions ("project labor agreements" or "PLAs") to *even compete* for large-scale federal construction projects. The Defendants have implemented this "PLA Mandate" in a Final Rule,[1] which Slayden challenges.

President Biden claimed authority to issue this mandate under the Federal Property and Administrative Services Act of 1949 ("Procurement Act"). President Trump presumably agrees, as his Administration has confirmed that it will enforce this policy. But

---

[1] Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects, 88 Fed. Reg. 88708 (Dec. 22, 2023).

the Procurement Act does not permit the direct regulation of federal contractors, especially on subjects (like labor policy) that Congress has addressed in other statutes. By asserting otherwise, the Government has sought to expand the Procurement Act from a statute regulating the government's internal procurement practices into a tool for imposing policies on a large sector of the U.S. economy that Congress never contemplated and would likely never approve. *See Kentucky v. Biden*, 57 F.4th 545, 548 (6th Cir. 2023) (noting that government contractors account for "approximately 20% of the nation's labor force").

For the reasons set forth here, the Court should vacate and set aside the Final Rule implementing the PLA Mandate and enjoin its enforcement.

**BACKGROUND AND STATEMENT OF FACTS**

**I.      The Federal Property and Administrative Services Act**

In the wake of World War II, Congress enacted the Procurement Act to streamline "[t]hree major internal activities of the Federal Government" that "suffer[ed] from a lack of central direction": "Supply, Records Management, and the Operation and Maintenance of Public Buildings." Commission on Organization of the Executive Branch of Government, Office of General Services 1 (1949); H.R. Rep. No. 81-670, at 1476 (1949). Among its major provisions, the Act created the General Services Administration ("GSA") and tasked its Administrator with prescribing policies related to procurement, the disposition of excess property, and the disposal of surplus property. Pub. L. No. 81-152, §§ 101(a), 103(a), 202(a), 203(a), 63 Stat. 377, 379 (1949). The Act also eliminated existing agencies and transferred their functions to GSA. *Id.* §§ 102(a), 103(b).

Of significance here, the Act enabled the President to "prescribe policies and directives" "to carry out" the Act, *id.* § 205(a), an authority that is now codified at 40 U.S.C. § 121(a). But contrary to what recent presidents have claimed, Section 121(a) confers only a limited authority. Far from being a blank check to regulate contractors, Section 121(a) is a housekeeping provision; it merely confirms the President's oversight of the procurement system.

## II.     Executive Order 14063 and the Final Rule

On February 4, 2022, President Biden—citing Section 121(a)—issued Executive Order 14063 ("EO 14063"). Exec. Order No. 14063, Use of Project Labor Agreements for Federal Construction Projects, 87 Fed. Reg. 7363 (Feb. 4, 2022). EO 14063 began by positing that large-scale construction projects, which the Order defines as those estimated to cost $35 million or more, "pose special challenges to efficient and timely procurement by the Federal Government." *Id.* §§ 1(a), 2(c). It then asserted that project labor agreements ("PLA")—pre-hire collective bargaining agreements—can increase efficiency for such projects and that the federal government was thus setting a baseline requirement for PLAs on large-scale federal construction projects. *Id.* § 1(b), (c). Particularly relevant here, EO 14063 advised that this required "every contractor or subcontractor engaged in construction on the project to agree, for that project, to negotiate or become a party to a [PLA] with one or more appropriate labor organizations." *Id.* § 3.

EO 14063 required that PLAs contain specific provisions, which must include "guarantees against strikes, lockouts, and similar job disruptions," mutually binding labor

dispute resolution policies, and "other mechanisms for labor-management cooperation on matters of mutual interest and concern, including productivity, quality of work, safety, and health." *Id.* § 4.

There are only three narrow exceptions to the PLA Mandate under EO 14063. *Id.* § 5. An exception "may" be allowed if an agency's "senior official" finds that a PLA would (1) not advance economy and efficiency, (2) reduce the number of offerors so as to prevent adequate competition, or (3) be inconsistent with federal law. *Id.* Whether they apply in any given situation is left to the agencies' unguided discretion. *Id.* They are never mandatory. *Id.*

On December 22, 2023, the Federal Acquisition Regulation Council ("FAR Council")[2] published the Final Rule implementing EO 14063 and its requirements. Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects, 88 Fed. Reg. 88708 (Dec. 22, 2023) ("Final Rule"). Its effective date was January 22, 2024. *Id.* at 88708. And the Trump Administration has enforced the PLA Mandate.

## III. Major Adverse Impact on Slayden

Slayden is already suffering the consequences of the PLA Mandate. Pursuant to the Final Rule, federal officials have imposed PLA requirements on several projects on which Slayden would have bid—***but for*** that requirement. For example, Slayden withdrew its bids

---

[2] The FAR Council, which consists of the Administrator for Federal Procurement Policy, the Administrator of GSA, the Secretary of Defense, and the Administrator of the National Aeronautics and Space Administration, exists to assist in the direction of government-wide policy and regulatory activity related to federal procurement.

for two projects on the Joint Elmendorf-Richardson Air Force/Army Base after the solicitations for those projects were amended to require project labor agreements. Ex. A., Decl. of Jeremiah Raby ¶ 33 ("Raby Decl."). Slayden was qualified to perform these projects. *Id.* ¶ 34.

Slayden objects on principled grounds to being compelled into an unwanted contractual relationship with a labor union.[3] And Slayden has various practical objections as well.[4] For example, the PLA Mandate is objectionable to Slayden as a sub-contractor because, under the Final Rule, PLAs are negotiated directly between a prime contractor and a labor union—meaning sub-contractors have no opportunity to influence the terms to be imposed. *See* Final Rule, 88 Fed. Reg. at 88724 (explaining that sub-contractors "do not negotiate the PLA directly with the union[;]" but "will ultimately need to . . . sign on to the PLA negotiated by the prospective offeror or prime contractor").[5] Relatedly, Slayden has good reason for concern that entering a PLA will cause discord with its employees because

---

[3] Slayden objects to any compelled contractual relationship with a labor union because the company and its employees see no benefit to entering into a labor agreement. If Slayden's employees wanted to be associated with a labor union, they would have voted for unionization long ago. Raby Decl. ¶ 19; Ex. B., Decl. of Brent Larson ¶¶ 5–6 ("Larson Decl."); Ex. C., Decl. of Lance Conley ("Conley Decl.") ¶¶ 5–6; Ex. D., Decl. of Alan Morlan, Jr. ("Morlan Decl.") ¶¶ 5–6; Ex. E., Decl. of Benjamin Dufour ("Dufour Decl.") ¶¶ 5–6; Ex. F., Decl. of Eric Schilling ("Schilling Decl.") ¶¶ 5–6.

[4] For one, the Final Rule gives contracting officers discretion to require submittal of the PLA after an award has been issued—which means that for some projects Slayden may not even know the terms of the PLA that will apply to the project at the time it would need to submit a bid. Understandably, Slayden and its employees are hesitant to bind themselves to terms and conditions they have not seen. Raby Decl. ¶ 16.

[5] Because the Rule denies subcontractors a seat at the bargaining table, Slayden cannot represent the best interests of its employees, which may be different from those of other businesses.

---

*Slayden Plumbing & Heating, Inc. v. GSA, et al.*  5
No. 3:25-cv-00310-SLG

Alaska's dominant trade union is already demanding that prime contractors agree to terms that would require every employee performing work on these federal projects to join a labor union and pay dues. *See* Raby Decl. ¶¶ 20–28.

The PLA Mandate forces Slayden to choose between acceding to an objectionable contractual relationship and being excluded from pursuing federal projects on which the company and its employees depend for their livelihood. Raby Decl. ¶ 14 (explaining Slayden cannot compete for large-scale federal construction projects it is qualified to perform unless it agrees to contract with a labor union); *id.* ¶ 12 (stating that large-scale federal projects have represented eighty percent of Slayden's revenue). And because the company is unwilling to comply with the Final Rule's objectionable PLA requirements, Slayden has been forced to reduce its workforce. Raby Decl. ¶ 15.

Because Slayden specializes in large-scale federal contracting work, it is not well-suited to transition to private sector projects. Yet if the PLA Mandate remains, Slayden must dramatically downsize or change its business model.

**STANDARD OF REVIEW**

A motion for summary judgment must be granted when there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020).[6] Here Slayden must show that the FAR Council exceeded its statutory authority, that its claimed authority

---

[6] There is no dispute as to any material merits-related fact. *See generally* 5 U.S.C. § 706; *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)).

violates the Constitution, or that the Final Rule is otherwise unlawful. 5 U.S.C. § 706. Slayden is entitled to declaratory relief under 28 U.S.C. § 2201.

## ARGUMENT

The Defendants claim that the President's Section 121(a) authority to oversee government agencies permits the PLA Mandate and its regulation of federal contractors. But this claim is wrong for three reasons.

First, the Procurement Act only authorizes the President to prescribe policies governing the internal functions of the federal government's procurement process. As the Sixth Circuit has held, Section 121(a) only authorizes the President to prescribe policies that make the government's processes in "contracting" for supplies and services more efficient; it does not invite the President to impose policies aimed at "mak[ing] contractors more efficient." *Kentucky v. Biden*, 57 F.4th 545, 553 (6th Cir. 2023).

Second, the President only has authority to prescribe policies that effectuate "an operative provision" of the Act. *Nebraska v. Su*, 121 F.4th 1, 7 (9th Cir. 2024). As such, the President has no authority to impose the PLA Mandate because no operative provision authorizes compelled project labor agreements.

Third, the PLA Mandate conflicts with the statutory requirement that contracting agencies must avoid taking actions that inhibit "full and open competition." 41 U.S.C. § 3306(a)(2)(A).

But if Section 121(a) delegates such broad authority as to permit the PLA Mandate, then it violates the nondelegation doctrine. That expansive interpretation would allow the

*Slayden Plumbing & Heating, Inc. v. GSA, et al.*      7
No. 3:25-cv-00310-SLG
Case 3:25-cv-00310-SLG      Document 20      Filed 03/27/26      Page 16 of 41

president to exercise freewheeling authority to impose any mandate on federal contractors that he pleases.

Last, the PLA Mandate should be vacated because the Agencies "failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Specifically, the Agencies failed to consider the likelihood that the PLA Mandate would give dominant labor unions leverage to coerce non-union companies (and their employees) into assenting to terms they would not otherwise accept.

## I.     The PLA Mandate Exceeds Statutory Authority

The President has no inherent authority to regulate federal contractors. Of course, "the federal government has the 'power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases.'" *Georgia v. President of the U.S.*, 46 F.4th 1283, 1292 (11th Cir. 2022) (quoting *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940)). But it is Congress—not the President—that holds this power "in the first instance." *Id.* at 1292–93 (citing *Perkins*, 310 U.S. at 131). Accordingly, the PLA Mandate is only lawful to the extent that Congress authorized such regulation under the Procurement Act. *Id.* at 1293. But nothing in the Procurement Act authorizes the PLA Mandate.

### A. Section 121(a) Does Not Authorize Direct Regulation of Federal Contractors' Internal Business Practices

The Government claims that Section 121(a) authorizes the PLA Mandate. *See* Final Rule, 88 Fed. Reg. at 88718. That Section provides that "[t]he President may prescribe

*Slayden Plumbing & Heating, Inc. v. GSA, et al.*     8
No. 3:25-cv-00310-SLG
Case 3:25-cv-00310-SLG     Document 20     Filed 03/27/26     Page 17 of 41

policies and directives that the President considers necessary to carry out this subtitle."[7] 40 U.S.C. § 121(a). But Congress has confirmed that this is authority only to regulate the internal functions of the federal procurement system. The current form of Section 121(a) is the outcome of a recodification that changed the language of the provision for the first time since its initial passage in 1949. In making the recodification, Congress clarified, in the statutory text, that it was making no substantive changes from the original enactment: The recodification "may not be construed as making a substantive change in existing laws." Pub. L. No. 107-217, § 5(b)(1), 116 Stat. 1062, 1303 (2002).

The U.S. Code thus requires that Section 121(a) be interpreted to mean the same thing it did in 1949. *See Georgia*, 46 F.4th at 1294. And in 1949, the provision read as follows:

> The President may prescribe such policies and directives, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of this Act, *which policies and directives shall govern the Administrator and executive agencies* in carrying out their respective functions hereunder.

Pub. L. No. 81-152, § 205(a), 63 Stat. 377, 389 (1949) (emphasis added). While the italicized language was removed during the recodification process, it thus remains in effect and, quite clearly, indicates that the President's policies and directives under now-Section

---

[7] "This subtitle" refers to subtitle I of Title 40 and most of division C of subtitle I of Title 41. 40 U.S.C. § 111(4).

*Slayden Plumbing & Heating, Inc. v. GSA, et al.*      9
No. 3:25-cv-00310-SLG
Case 3:25-cv-00310-SLG    Document 20    Filed 03/27/26    Page 18 of 41

121(a) may govern only the Administrator of the GSA and executive agencies—not federal contractors.[8]

The rest of the text is likewise clear in authorizing the President only to adopt "internally focused [policies]" that "speak[] to government efficiency, not contractor efficiency." *Kentucky*, 57 F.4th at 553. Section 121(a) allows the President to "prescribe policies and directives . . . to carry out this subtitle[.]" But "prescrib[ing] policies and directives" for the purposes of carrying out a statute's provisions is very different from issuing procurement ***regulations*** for the purpose of ensuring the federal government has what it needs.[9] While Congress gave the President authority to do the former, it tasked the FAR Council with doing the latter. Moreover, the Procurement Act does not impose obligations on non-governmental actors. Accordingly, there is no policy or directive the President could impose on federal contractors that would "carry out" the statute's provisions, which speak only to the roles and responsibilities of the federal agencies involved in facilitating an efficient procurement system. *See Georgia*, 46 F.4th at 1298

---

[8] Further confirming the President's limited regulatory authority under Section 121(a), the original Procurement Act parroted this language elsewhere. *See id.* § 404(a), 63 Stat. at 398 ("The President may prescribe such policies, not inconsistent with the provisions of this title, as he shall deem necessary to effectuate the provisions of this title, which provisions *shall guide each executive agency* in carrying out its functions hereunder.") (emphasis added).

[9] The Defense Production Act ("DPA") shows how Congress could have written the Procurement Act to allow the President to issue procurement regulations. The DPA allowed the President to "prescribe such regulations and issue such orders as the President may determine to be appropriate to carry out this chapter." 50 U.S.C. § 4554(a).

(explaining that Section 121(a) "delegates the power to 'carry out *this subtitle*,' which contains a compilation of contracting rules for the [GSA] and other executive agencies").

Nothing else in the Act even hints at the possibility that Section 121(a) was intended to authorize external regulation of private actors. Take, for example, the structure of Section 121. That structure makes clear that Congress was delegating authority only for the President to prescribe policies governing the internal workings of the government's procurement operations. For one, Congress entitled Section 121 "Administrative," which indicates that the provisions within concern only the internal management of the agencies the statute implicates. Each of the subsections confirms the point.[10] For example, Subsection (b) tasks the Comptroller General with establishing standards for accounting for property and overseeing agencies' compliance with them. 40 U.S.C. § 121(b)(1)–(3). Subsection (c) authorizes the GSA Administrator to promulgate regulations necessary to carry out his functions under the Act and requires other agency heads to issue directives to carry out the Administrator's regulations. *Id.* § 121(c)(1)–(2). Subsections (d) and (e) specify to whom the GSA Administrator can delegate authority, what authority he can and cannot delegate, and who may perform functions under the Act. *Id.* § 121(d)–(e). And Subsection (g) tells the GSA Administrator to consult other agencies to accomplish all of these tasks. *Id.* § 121(g).

---

[10] The organization of the aforementioned Subsections mirror the way they were organized in the original Procurement Act.

*Slayden Plumbing & Heating, Inc. v. GSA, et al.*      11
No. 3:25-cv-00310-SLG
Case 3:25-cv-00310-SLG      Document 20      Filed 03/27/26      Page 20 of 41

Were there any doubt as to the proper interpretation of Section 121(a), Congress's commentary on that provision eliminates it. In their section-by-section analyses, the House and Senate Reports to the original Procurement Act explained that Section 205(a) (now Section 121(a)) was necessary "[b]y reason of the impact of this legislation upon all agencies in the executive establishment[.]" H.R. Rep. No. 81-670 at 1491; S. Rep. No. 81-475 at 19. The authority it conferred would thus permit the President to settle any disputes among agencies. H.R. Rep. No. 81-670 at 1504.

For good reason then, Presidents accepted that the Procurement Act limited them to prescribing policies and directives to govern the GSA Administrator and executive agencies for nearly the first three decades following the original enactment. *See Kentucky*, 57 F.4th at 549 (explaining the history). No President claimed authority to regulate outside the federal government under Section 121(a) until 1978 when President Carter mandated that contractors abide by certain price and wage regulations—a mandate that, at that time, constituted a novel, previously "unheralded [claim of] power."[11] *See Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014) (*UARG*).

---

[11] No one seemed to have even conceived of the idea that Section 121(a) might authorize regulation of private actors until 1971 when, in dicta, the Third Circuit referenced the Procurement Act as one potential source of authority for President Eisenhower's Executive Order barring federal contractors from discrimination in employment. *Contractors Ass'n of E. Pa. v. Sec. of Lab.*, 442 F.2d 159, 170 (3d Cir. 1971). But that decision is not even persuasive because it did not consider the textual limitations discussed here. And in any event, neither President Eisenhower nor the Nixon Administration invoked Section 121(a) as an authority to regulate external actors.

---

*Slayden Plumbing & Heating, Inc. v. GSA, et al.*　　12
No. 3:25-cv-00310-SLG

Unsurprisingly, successive Presidents have invoked the expanded interpretation of Section 121(a) to bypass Congress in carrying out their preferred regulatory agenda on such sensitive subjects as minimum wage hikes, vaccine mandates, requirements to use an immigration-status verification system, and now the PLA Mandate.[12] But such "contractor mandate[s] [are] unlawful" because they conflict with "the most natural reading" of the statutory text, *Kentucky*, 57 F.4th at 553, which is that Section 121(a) gives the President the power to direct *agencies* in their pursuit of an efficient federal procurement system.

For all these reasons, Section 121(a) cannot be interpreted to delegate authority to regulate external actors. This understanding of Section 121(a) led the Sixth Circuit to conclude that the President lacked authority to impose a vaccine mandate on contractors. *Kentucky*, 57 F.4th at 553. The Ninth Circuit evinced a similar view with regard to a minimum wage mandate on federal contractors. *Nebraska*, 121 F.4th at 13.

### B. The PLA Mandate Is Not "Necessary to Carry Out" Any Operative Provision

Even if Section 121(a) authorizes the President to regulate external actors (it does not), Congress clearly limited the President's authority to do so. The Procurement Act does

---

[12] *See* Exec. Order No. 13658, 79 Fed. Reg. 9851 (Feb. 12, 2014) (raising minimum wage to $10.10 per hour); Exec. Order No. 14026, 86 Fed. Reg. 22835 (Apr. 27, 2021) (raising minimum wage to $15 per hour); Exec. Order No. 14042, 86 Fed. Reg. 50985 (Sep. 9, 2021) (requiring compliance with COVID-19 safety protocols); Exec. Order No. 13465, 73 Fed. Reg. 33285 (June 6, 2008) (requiring contractors to flag immigration status with federal authorities). *See also* Exec. Order No. 12954, 60 Fed. Reg. 13023 (Mar. 8, 1995) (prohibiting contractors from replacing striking employees); Exec. Order No. 13201, 66 Fed. Reg. 11221 (Feb. 17, 2001) (mandating contractors must notify employees of labor rights); Exec. Order No. 13706, 80 Fed. Reg. 54697 (Sep. 7, 2015) (paid sick leave mandate).

*Slayden Plumbing & Heating, Inc. v. GSA, et al.*    13
No. 3:25-cv-00310-SLG
Case 3:25-cv-00310-SLG    Document 20    Filed 03/27/26    Page 22 of 41

not give the President license to prescribe any policy he might deem fit in his idiosyncratic judgment. On the contrary, it limits him to prescribing policies and directives as may be "necessary to carry out this subtitle." This means that "the President can only use § 121 to implement one of the [Act's] operative sections." *Su*, 121 F.4th at 7. After all, "[t]he phrase 'carry out' requires a task to be done—something 'to put into practice or effect.'" *Id*. at 8 (quoting *Kentucky*, 57 F.4th at 552).

No operative provision authorizes the President to impose the PLA Mandate—just as no operative provision authorized the President to impose heightened minimum wage standards, *Su*, 121 F.4th at 9, or vaccine mandates, *Kentucky*, 57 F.4th at 555. The Government might claim that the Procurement Act's general statement of purpose, 40 U.S.C. § 101, is an operative provision. But the Ninth Circuit squarely rejected this argument in *Su*, 121 F.4th at 7, (explaining that Section 101 "is not a hook for the President's exercise of authority under the [Procurement Act]" because Section 121(a) "does not authorize the President to 'carry out' the [Procurement Act's] purpose"); *Georgia*, 46 F.4th at 1298 ("[T]he purpose statement is not an operative component of the subtitle—it offers the 'purpose' animating the operative provisions."). *See also Kentucky*, 57 F.4th at 552.

Here, no operative provision permits a policy of compelling private contractors to enter labor agreements as a condition of bidding on federal projects.[13] *Accord Chrysler*

---

[13] In addition to Section 101, the final rule asserts that the PLA Mandate is consistent with and carries out 40 U.S.C. § 501(b)(2)(A); 41 U.S.C. § 3103(a), (c); 41 U.S.C. § 3703; and

*Slayden Plumbing & Heating, Inc. v. GSA, et al.*     14
No. 3:25-cv-00310-SLG
Case 3:25-cv-00310-SLG     Document 20     Filed 03/27/26     Page 23 of 41

*Corp. v. Brown*, 441 U.S. 281, 304 n.34 (1979) (suggesting that the President lacked authority to prohibit discrimination by federal contractors under the Procurement Act because "nowhere in the Act is there a specific reference to employment discrimination"). As the Ninth Circuit stressed in *Su*, Congress used clear language when it wanted to authorize regulation of wage and hour issues in other statutes, and that "is [] the kind of statutory language" the court "look[s] for to determine whether Congress authorized such policy [in the Procurement Act]." 121 F.4th at 13. And the same is true here. One would expect that Congress would have spoken clearly if it wanted to authorize regulation of labor relations between private contractors and their employees. *See Kentucky*, 57 F.4th at 552 (asking "[d]oes [this] comport with 'common sense as to the manner in which Congress is likely to delegate' such power?"). *See also Biden v. Nebraska*, 600 U.S. 477, 511–13 (2023) (Barrett, J., concurring) (arguing that agency law principles bear on textual interpretation because "[c]ontext is not found exclusively 'within the four corners' of a statute") (quoting John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2457 (2003)).

In the specific context of labor relations, there is an even greater reason to expect that Congress would have spoken clearly if it had intended to authorize the President to dragoon federal contractors into labor agreements. Prior to the enactment of the Procurement Act, Congress enacted the National Labor Relations Act, 29 U.S.C. §§ 151–

40 U.S.C. § 111; 40 U.S.C. § 121(c); and 41 U.S.C. § 1303. 88 Fed. Reg. at 88718. But it does not explain why or how. *Id.*

*Slayden Plumbing & Heating, Inc. v. GSA, et al.*        15
No. 3:25-cv-00310-SLG

Case 3:25-cv-00310-SLG    Document 20    Filed 03/27/26    Page 24 of 41

169—comprehensive legislation governing labor relations and speaking to these important and politically sensitive matters. And, significantly, in 1947, Congress opted against a policy of compelling labor agreements in the NLRA. *See* 29 U.S.C. § 158(d) (stating that the NLRA "does not compel either party to agree to a proposal or require the making of a concession"). Rather, Congress's policy, under the NLRA, was to allow freedom of choice. *See N.L.R.B. v. American Nat'l Ins. Co.*, 343 U.S. 395, 402–04 (1952) (explaining Congress's legislative compromise). It is highly doubtful that a mere two years later, Congress would authorize the President to establish a contrary policy—to force unwilling parties to contract with one another—without making that intent unequivocally clear.

And even if the President could impose a PLA Mandate in the absence of a clear statement authorizing it, there is no plausible argument that the PLA Mandate is "necessary" within the meaning of that term as Congress would have understood it. The Procurement Act does not define the word "necessary" for purposes of Section 121(a). But "[t]he ordinary meaning of 'necessary' is 'essential.'" *Mi Familia Vota v. Fontes*, 129 F.4th 691, 713 (9th Cir. 2025) (citing *Williams v. Taylor*, 529 U.S. 420, 431 (2000); *Necessary*, Black's Law Dictionary (12th ed. 2024); and *Necessary*, Oxford English Dictionary (2d ed. 1989)). A less strict interpretation of "necessary" may also mean "needful."[14] *Mi Familia Vota v. Fontes*, 152 F.4th 1153 (Mem.) (9th Cir. 2025) (Nelson, J., concurring in

---

[14] To interpret Section 121(a) otherwise would impermissibly read the word "necessary" out of the statute. *See United States v. Cabaccang*, 332 F.3d 622, 627 (9th Cir. 2003) (en banc) ("[W]e must interpret statutes as a whole, giving effect to each word[.]"); *United States v. Butler*, 297 U.S. 1, 65 (1936) (explaining that words in the legal text "cannot be meaningless, else they would not have been used").

dissent from denial of rehearing). But the final rule is not "necessary" because it is neither "essential" nor "needful."[15]

For that matter, historical practice demonstrates that the PLA Mandate is not objectively "necessary" to carrying out the Procurement Act's provisions. After all, no President in the nearly seventy-five years following the passage of the Procurement Act considered PLAs necessary to an efficient procurement program. The assertion that PLAs are "necessary" is not only previously "unheralded[,]" *UARG*, 573 U.S. at 324, but also flatly contravened by the fact that presidential administrations have affirmatively prohibited PLAs in federal construction projects and been able to run a functioning procurement system. *See* Exec. Order No. 12818, 57 Fed. Reg. 48713 (Oct. 28, 1992) (affirmatively prohibiting PLAs in federal construction projects).

Moreover, it is clear that PLAs are not necessary to the functioning of the federal procurement system because PLA requirements were very rarely imposed even when encouraged. In 2009, President Obama reversed a 17-year-old prohibition on PLAs to encourage—but not mandate—their use. Exec. Order No. 13502, 74 Fed. Reg. 6985 (Feb. 11, 2009). As the final rule admits, of the approximately 2,000 contracts eligible for a PLA between 2009 and 2021, only twelve included one. Final Rule, 88 Fed. Reg. at 88717. The

---

[15] The most Defendants can say is that PLAs are tools that *might* be beneficial. *See, e.g.*, Final Rule, 88 Fed. Reg. at 88711 ("PLAs can help reduce the effects of the construction labor shortage"); *id.* at 88717 ("PLAs can provide many advantages"); *id.* at 88713–14 ("PLAs may improve workplace safety"); *id.* at 88714 ("Use of PLAs may help reduce the risk of noncompliance with labor laws").

*Slayden Plumbing & Heating, Inc. v. GSA, et al.*     17
No. 3:25-cv-00310-SLG
Case 3:25-cv-00310-SLG     Document 20     Filed 03/27/26     Page 26 of 41

fact that PLAs were routinely rejected in 99.4% of contracts flatly contravenes any claim that they are "necessary" to carrying out the Procurement Act.

### C. The PLA Mandate Is Not "Consistent" with Other Provisions

Additionally, the PLA Mandate is unlawful because it conflicts with other provisions in the Procurement Act. *See* 40 U.S.C. § 121(a) (limiting the President to pursuing policies that are "consistent" with the Act); *FCC v. Consumers' Rsch.*, 606 U.S. 656, 690 (2025) (explaining that the statutory authorization for the FCC to articulate "[a]dditional principles" to guide the universal service program was not unlimited because those principles had to be "consistent with" the rest of the statute, which prohibited the FCC from "chang[ing] any of the statute's other principles").

First, the PLA Mandate does not comply with the Procurement Act's provisions requiring "full and open competition." 41 U.S.C. §§ 3301(a)(1), 3306(a)(2)(A). In Section 3301(a)(1), Congress required that agencies conduct the procurement process in a way that "obtain[s] full and open competition through the use of competitive procedures." Likewise, Section 3306(a)(2)(A) requires project solicitations to "permit full and open competition[.]" Congress has defined "full and open competition" to mean that "all responsible sources are permitted to submit sealed bids or competitive proposals on the procurement." 41 U.S.C. § 107. Whether a prospective contractor qualifies as a "responsible source" depends on several factors related to the contractor's track record and to its financial and technical ability to perform the contract. 41 U.S.C. § 113.

The PLA Mandate contravenes Congress's "full and open competition" requirement, however, because it excludes qualified companies from bidding on large-

scale federal construction projects. *See Su*, 121 F.4th at 12 (concluding that a minimum wage mandate "invariably impair[s] competition in the market for federal contracting services"). Slayden, for example, has been forced to withdraw two bids for projects it was fully capable of performing because of amendments to the solicitations that added a PLA requirement. Raby Decl. ¶¶ 33–34. The PLA Mandate thus does not permit "all responsible sources . . . to submit sealed bids or competitive proposals[.]" *See* 41 U.S.C. § 107. Multiple courts have already found that the PLA Mandate does not promote "full and open competition." *See MVL USA, Inc. v. United States*, 174 Fed. Cl. 437 (Jan. 21, 2025) (finding that the PLA mandate violated § 3301(a) because the plaintiffs were otherwise qualified). *See also ABC Fla. First Coast Chapter v. GSA*, Case No. 3:24-cv-318-WWB-MCR (M.D. Fla. Mar. 28, 2025) (finding likelihood of success on the merits of the § 3301 claim but denying preliminary injunction because of a lack of irreparable harm).

Indeed, the Final Rule contemplates a reduction in competition. Final Rule, 88 Fed. Reg. at 88728. During the rulemaking process, "[n]umerous" commenters expressed concern that the PLA Mandate would frustrate competition. *See id.* at 88709. The Final Rule tried to assuage this concern by saying that one of the exemptions—the one that supposedly applies when market research indicates that the PLA requirement would lead to insufficient competition—addresses this concern. But that exception is so narrow that it is unavailable even when the PLA Mandate precludes contractors from bidding. Indeed, the Final Rule says that the PLA Mandate will apply unless the market research shows that the Mandate "would *substantially* reduce the number of potential offerors to such a degree

that adequate competition at a fair and reasonable price could not be achieved." 88 Fed. Reg. at 88727–28 (emphasis added). The Final Rule further clarifies that the "likely reduction in the number of potential offerors is not, by itself, sufficient to except a contract from" the Mandate. *Id.* at 88728.

What is more, Commenters' predictions that the PLA Mandate would impair "full and open competition" notwithstanding the market research exception have proven correct. At the beginning of the Trump Administration, for example, the GSA and the Department of Defense exempted certain construction projects from the PLA Mandate based on market research indicating "a high probability for substantial reduction in the number of potential offers and a substantial increase in price for future projects."[16] But the Office of Management and Budget ("OMB") reversed these exemptions and concluded that a mere "two qualified offers should generally be sufficient to provide adequate price competition for negotiated contracts[.]" Ex. I, Off. of Mgmt. & Budget, Exec. Off. of the President, Memorandum M-25-29, Use of Project Labor Agreements on Federal Construction Projects—Amendments to OMB Memorandum M-24-06, at 2 (June 12, 2025). OMB emphasized that the market research exception *will not apply* "even if the number of offerors who indicate they will not compete because of the PLA is significantly higher than

---

[16] Ex. G, Memorandum from Jeffrey Koses, Senior Procurement Executive, to the Public Buildings Service (Feb. 12, 2025) at 2. *See also* Ex. H, Memorandum from John Tenaglia, Principal Director, Defense Pricing, Contracting, and Acquisition Policy to Certain Military Commanders (Feb. 7, 2025). Slayden requests that the Court take judicial notice of these memoranda because their existence "is not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

*Slayden Plumbing & Heating, Inc. v. GSA, et al.*     20
No. 3:25-cv-00310-SLG
Case 3:25-cv-00310-SLG     Document 20     Filed 03/27/26     Page 29 of 41

the number of sources who have expressed an intent to compete." *Id*. Yet that still excludes qualified bidders like Slayden.

Second, the PLA Mandate is inconsistent with the Procurement Act's goals of promoting economy and efficiency. The PLA Mandate is projected to impose *added* costs of between $8.87 million and $53.54 million *each year*. Final Rule, 88 Fed. Reg. at 88725. And as the Ninth Circuit recognized in *Su*, a policy that "on net" raises costs "cannot be deemed to promote economy and efficiency." *Su*, 121 F.4th at 11. The Final Rule estimates that it will take anywhere from "100 to 200 hours for each party involved in the development, negotiation, and implementation of a PLA" and further acknowledges that "most PLAs will be negotiated from scratch." 88 Fed. Reg. at 88722, 88724. While the Final Rule permits exemptions to the PLA Mandate, that process requires the contracting officer to write and route an explanation to the proper senior procurement executive for each exemption request—a process the final rule estimates could cost tens of thousands of dollars each year. 88 Fed. Reg. at 88725. These admitted ***inefficiencies*** confirm that the PLA Mandate is not "consistent with" Congress's most basic policy choice that the procurement system should be run to save money rather than raise costs.

## II.    The Government's Unbridled Interpretation Violates the Nondelegation Doctrine

Under the Government's interpretation of Section 121, there are no limits on the President's authority to impose regulatory mandates on federal contractors and their employees. Under that (flawed) interpretation, the President can impose any mandate he pleases, so long as he deems that such regulation serves his subjective conception of

economy and efficiency. Because that elastic interpretation denies any objective boundaries limiting the President's Section 121 authority, he might raise the minimum wage to $20 per hour, require contractors to provide free health care, conduct annual implicit bias or diversity and equity training, mandate vaccinations, require reductions in greenhouse gas emissions, or anything else he thinks desirable. Under that interpretation, the President is limited only by the bounds of his own imagination.

This is not hyperbole. In recent cases, the Government has defended controversial contractor mandates by relying on the Act's purpose statement, codified at 40 U.S.C. § 101.[17] Section 101 explains that the Act's purpose "is to provide the Federal Government with an economical and efficient system" for several activities including, as relevant here, "[p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting[.]" As such, the Government has argued—in defending minimum wage and vaccine mandates—that Sections 121(a) and 101 work together to allow the President to prescribe any policy or directive that he "considers necessary to carry out" his view of economy and efficiency in procurement and contracting. *Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707 (10th Cir. 2024); *Kentucky*, 57 F.4th at 551; *Su*, 121 F.4th at 7.

---

[17] *See, e.g.*, *Su*, 121 F.4th at 7; *Mayes v. Biden*, 67 F.4th 921, 926–27 (9th Cir. 2023), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023); *Bradford v. Dep't of Lab.* 101 F.4th 707, 713 (10th Cir. 2024); *Georgia*, 46 F.4th at 1297–98. The Final Rule also invokes this Section. *See* 88 Fed. Reg. at 88718.

*Slayden Plumbing & Heating, Inc. v. GSA, et al.*     22
No. 3:25-cv-00310-SLG
Case 3:25-cv-00310-SLG     Document 20     Filed 03/27/26     Page 31 of 41

For example, the Tenth Circuit accepted this line of argument in upholding a mandate, imposed on private businesses, as a condition of allowing them to operate on federal lands. From its view, the Act allows the President to impose any mandate he judges will advance the goals of economy and efficiency—with emphasis that courts must respect "the President's judgment as to how a given executive order is likely to advance the statute's objectives[,]" even when his mandates are expected to "increase costs" to the government. *Bradford*, 101 F.4th at 721–22. But as Judge Eid pointed out in dissent, that leaves everything to the President's subjective judgment. *See id.* at 738 (Eid, J., dissenting) (finding that the majority's interpretation violates the nondelegation doctrine because, under that approach, the Procurement Act "does not require that the President's policies actually be necessary, only that he subjectively '*considers* them necessary' to do whatever he wants under the act").

But of course, statutes should not be interpreted as delegating boundless authority— not least because it would violate the nondelegation doctrine. *See Kentucky*, 23 F.4th at 607 n.14 ("If the government's interpretation were correct . . . that *certainly* would present non-delegation concerns."). The avoidance canon requires that courts err on the side of rejecting expansive "administrative interpretation[s]" that would push "the outer limits of Congress's power" in the absence of "a clear indication that Congress intended that result." *Solid Waste Agency of Northern Cook Cnty. v. U.S. Army Corps of Engr's*, 531 U.S. 159, 174 (2001). *Accord Consumers' Rsch.*, 606 U.S. at 691 ("Statutes . . . should be read, if possible, to comport with the Constitution."). For this reason, this Court should reject the

Government's elastic interpretation of Sections 121 and 101, and embrace Plaintiff's reasonable narrowing construction as set forth in Section I. *See, e.g.*, *Kaweah Delta Health Care Dist. v. Becerra*, 123 F.4th 939, 951–52 (9th Cir. 2024) (rejecting the claim that Congress delegated authority for an officer to make "adjustments" to governing law as he "deem[ed] appropriate" because this interpretation would violate the nondelegation doctrine).

Yet if the Government's interpretation is correct—as conceived by the Tenth Circuit in *Bradford*—then the Procurement Act violates the nondelegation doctrine. The nondelegation doctrine derives from U.S. Const. art. I, §§ 1, 8, which vests the power to make law exclusively with Congress. "Accompanying that assignment of power to Congress is a bar on its further delegation: Legislative power, we have held, belongs to the legislative branch, and to no other." *Consumers' Rsch.*, 606 U.S. at 672 (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001)). As such, the nondelegation doctrine requires that Congress (1) establish the relevant "general policy" the agency must pursue, and (2) impose objective "boundaries" to limit discretion. *Id.* at 680 (citing *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)). But Congress established neither under the Government's interpretation.

There are no "boundaries" if the President can decide for himself what the goal of efficiency and economy means, and what will advance his personal conception of that goal. If the President is not limited to pursuing policies that reduce federal contracting costs (as

*Slayden Plumbing & Heating, Inc. v. GSA, et al.*    24
No. 3:25-cv-00310-SLG
Case 3:25-cv-00310-SLG    Document 20    Filed 03/27/26    Page 33 of 41

the plain meaning of those terms would suggest),[18] then the President could mandate anything. For example, the President might mandate "that 'all federal contractors certify that their employees take daily vitamins, live in smoke-free homes, exercise three times a week, or even, at the extremity, take birth control in order to reduce absenteeism related to childbirth and childcare.'" *Su*, 121 F.4th at 10 (quoting *Louisiana v. Biden*, 55 F.4th 1017, 1032 (5th Cir. 2022)). For that matter, the President might—under the Government's interpretation—impose any form of regulation on contractors that President Roosevelt might have chosen to impose through industry codes under the NIRA.

For the same reason, there is no "general policy" guiding the exercise of discretion if the President is free to decide for himself what it means to advance efficiency and economy. Under the Government's interpretation, the principles of economy and efficiency are, at best, only nominal limitations that leave open a "wide field of legislative possibilities." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 538 (1935). After all, the terms "economy" and "efficiency" cannot serve as a North Star if they are understood as "empty vessel[s]" to be filled with whatever meaning the President pleases. *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 702 (2022).

Nor does Section 121(a)'s requirement that the President's policies be "consistent" with the Act serve as a sufficient "boundary" or "general policy" if the President

---

[18] "[E]conomical" means "careful, efficient, and prudent use of resources;" and "operating with little waste or at a saving." *Economical*, Merriam Webster, https://www.merriam-webster.com/dictionary/economical. Likewise, "efficiency" means "effective operation as measured by a comparison of production with cost (as in energy, time, and money)." *Efficiency*, Merriam Webster, https://www.merriam-webster.com/dictionary/efficiency.

---

determines—at his sole discretion—what kinds of policies or directives are necessary to promote economy and efficiency. Under that expansive view, the President also decides for himself what policies or directives are consistent with his subjective view of economy and efficiency. *Accord Louisiana*, 55 F.4th at 1031 (rejecting the government's suggestion that requiring a policy or directive to have a sufficient nexus to economy and efficiency constitutes a boundary because such a nexus draws "no line at all").

This case illustrates as much. Here, the President—like others before him—used the Procurement Act as a tool to pursue broader regulatory goals that do not relate to procurement and that do not promote economy or efficiency. If economy meaningfully limited the President's authority, it would prevent policies that raise project costs. But the Defendants maintain that the President can impose the PLA Mandate even though they acknowledge it *raises costs* for the federal government.[19]

If the Court rejects Slayden's interpretation of Section 121(a), it should find that the government's likely interpretation of the Procurement Act violates the nondelegation doctrine.

## III. The PLA Mandate Is Arbitrary and Capricious

Agency action is arbitrary and capricious when the agency has "entirely failed to consider an important aspect of the problem . . ." *Cascadia Wildlands v. United States Bureau of Land Mgmt.*, 153 F.4th 869, 892 (9th Cir. 2025) (cleaned up); 5 U.S.C. §

---

[19] Congress has established no "general policy" on the important matter of whether to force labor agreements between unwilling parties.

706(2)(a). An agency's failure "to reasonably consider the relevant issues and reasonably explain" its decision is also arbitrary and capricious. *Fuson v. Off. of Navajo and Hopi Indian Relocation*, 134 F.4th 1010, 1019 (9th Cir. 2025). Here, the FAR Council entirely failed to consider the fact that a PLA requirement enables dominant unions to exert a stranglehold over federal contracting at the expense of non-union contractors. As a result, the FAR Council's analysis of its effects for non-unionized contractors is unreasonable, fatally flawed, and deeply implausible.

As the final rule acknowledges, "[m]any respondents" were worried about "the rule's likely impact on non-unionized contractors." Final Rule, 88 Fed. Reg. at 88712. Several commenters raised the specific concern that a PLA Mandate would give unions an unfair advantage in labor contract negotiations and empower unions to influence the bidding process. *See, e.g.*, AR0126 (observing that "[u]nions will have all of the negotiation leverage" and may "have an unfair say into who would win the bid by giving a more-favorable PLA to one offeror over another"); AR0571 (explaining that, because unions need not enter PLAs at all, the PLA requirement "grants unions incredible bargaining leverage over prospective offerors and contractors").

In a stunning response, the FAR Council cast this concern aside on several non-responsive grounds: that "PLAs have been used successfully for decades," that no data shows "parties have been systematically unable to negotiate PLAs because of bad-faith bargaining by unions," and that unions have an economic incentive to agree on a PLA. Final Rule, 88 Fed. Reg. at 88712–13. These responses are non-sequiturs.

For one, the FAR Council failed to acknowledge the whole point of commenters' concerns: that the Final Rule would create a new regime of *mandatory* PLAs. As the Government admits elsewhere, "PLAs have not been mandated" before. *Id.* at 88722. But the Agencies never address whether imposing a PLA Mandate puts a thumb on the scale favoring labor unions in contract negotiations.[20]

Relatedly, the Government's claim that contractors have never been "systematically unable to negotiate PLAs" is inapposite since a federal PLA mandate has never existed. And more fundamentally, that response ignores commenters' concern that unions will leverage the PLA Mandate to force concessions to which non-union companies would not otherwise agree. Non-union companies would have no legal obligation to entertain any terms proposed by a union were it not for the PLA Mandate.

What is more, the claim that the unions have an economic incentive to negotiate PLAs overlooks unions' stronger incentive to force concessions. Whatever economic incentives labor unions may have to work out some kind of agreement, contractors have a far greater one in the form of contracts worth $35 million or more. This imbalance—created by the PLA Mandate—incentivizes contractors to accede to concessions if that's the price of doing business, especially in geographically-isolated areas where a dominant labor union may have especially powerful leverage to force concessions. This imbalance is not

---

[20] The concern that the PLA Mandate may give unions leverage to force concessions is very similar to the "fears" that prompted Congress to make clear that employers have no obligation to agree to any term in a proposed labor agreement under the NLRA. *See NLRB v. Am. Nat. Ins. Co.*, 343 U.S. 395, 404 (1952) (explaining that Congress was concerned that employers were being forced into making "concessions").

*Slayden Plumbing & Heating, Inc. v. GSA, et al.*     28
No. 3:25-cv-00310-SLG
Case 3:25-cv-00310-SLG     Document 20     Filed 03/27/26     Page 37 of 41

a safeguard against bad faith bargaining; it is the very source of commenters' concern that the mandate enables unions to force concessions.

Slayden's plight highlights the Final Rule's inadequate analysis of its effects for non-union contractors. The Rule repeatedly insists, for example, that non-union contractors need not worry because it does not require anyone to join a union. *See, e.g.*, Final Rule, 88 Fed. Reg. at 88725. But in at least some isolated labor markets (like Alaska), unions' leverage under the PLA Mandate is so strong that the *unions* can require unionization as a condition of a PLA—which contractors need to perform large-scale federal construction projects.

Slayden has already experienced this consequence first-hand. In Alaska, every union belongs to the Southcentral Alaska Council of Building & Construction Trades ("the Council"). Raby Decl. ¶ 20. And the Council has indicated that it will protest any bid that does not use the Council's PLA if that bid includes even just one of its member contractors. *Id.* ¶ 21. Due to Alaska's remote location and specialized construction needs, it would be impossible for a prime contractor to submit a reasonably-priced bid that does not include at least one of the Council's member subcontractors. *Id.* ¶¶ 27–30. The practical effect of the Council's PLA is thus to require that only subcontractors who agree to the Council's PLA may participate on a federal project. *Id.* ¶ 30. Because the PLA requires that employees join the unions of their respective trades, and Slayden's employees do not wish to join a union, prime contractors may therefore not use Slayden for its projects. Larson

Decl. ¶ 5; Conley Decl. ¶ 5; Morlan Decl. ¶ 5; Dufour Decl. ¶ 5; Schilling Decl. ¶ 5 Raby Decl. ¶¶ 31–32.

## IV. Slayden Has Article III Standing

To establish Article III standing, a plaintiff must show that: "(1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision." *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1225 (9th Cir. 2008) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Slayden has suffered an injury-in-fact for the simple reason that it has been excluded from working on federal projects that it was qualified to perform on account of the PLA Mandate. Raby Decl. ¶¶ 33–34. As a result, Slayden has lost revenue, and will continue to lose revenue. *Id.* ¶¶ 32–33, 35. These present and anticipated economic losses are a concrete injury-in-fact. *See Phillips v. U.S. Customs & Border Prot.*, 74 F.4th 986, 991 (9th Cir. 2023) ("Tangible injuries, like . . . monetary losses, are concrete.") (citing *TransUnion LLC v. Ramerez*, 594 U.S. 413, 425 (2021)). And Slayden suffers a concrete injury merely in being forced into a Hobson's Choice between an objectionable contractual relationship and forgoing business opportunities. *See Associated Gen. Contractors of Am.*

*Slayden Plumbing & Heating, Inc. v. GSA, et al.*     30
No. 3:25-cv-00310-SLG
Case 3:25-cv-00310-SLG     Document 20     Filed 03/27/26     Page 39 of 41

*v. Metro. Water Dist. of S. Cal.*, 159 F.3d 1178, 1181 (9th Cir. 1998) (finding standing for businesses that "are being deterred from bidding [] because of [] PLA[]" requirements).[21]

Slayden's injuries are plainly caused by the PLA Mandate and would be redressed by an order setting the Final Rule aside. *See Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005) (explaining that the redressability element is satisfied so long as it is "likely, as opposed to merely speculative" that an injury "will be redressed by a favorable decision"). *See also Diamond Alternative Energy v. U.S. Env't Prot. Agency*, 606 U.S. 100, 114 (2025) ("Even 'one dollar' of additional revenue" will "satisfy the redressability component of Article III standing.") (quoting *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021)).

## CONCLUSION

For the foregoing reasons, the Court should grant Slayden's summary judgment motion.

Respectfully submitted,
KERRY HUNT*
LUKE A. WAKE*
CHARLES M. BRANDT*

By___/s/ *Luke A. Wake*_____
LUKE A. WAKE, *Pro Hac Vice*
Cal. Bar No. 264647

*Attorneys for Plaintiff*
*Slayden Plumbing & Heating, Inc.*

**Pro Hac Vice*

---

[21] Where "the legality of government action or inaction" is being challenged, "there is ordinarily little question" of standing for a plaintiff who is the "object of the action (or foregone action)." *Lujan*, 504 U.S. at 561–62.

*Slayden Plumbing & Heating, Inc. v. GSA, et al.*     31
No. 3:25-cv-00310-SLG
Case 3:25-cv-00310-SLG     Document 20     Filed 03/27/26     Page 40 of 41

## CERTIFICATE OF SERVICE

I certify that on March 27, 2026, I filed the foregoing using the Court's ECF system, which will provide service to all counsel of record.

_/s/ Luke A. Wake_____
LUKE A. WAKE, *Pro Hac Vice*